# ANTOINE ET UX. v. WASHINGTON

No. 73–717.   Argued December 16, 1974—Decided February 19, 1975

*Mason D. Morisset* argued the cause and filed a brief for appellants.

*Joseph Lawrence Coniff, Jr.,* Assistant Attorney General of Washington, argued the cause for appellee. With him on the briefs were *Slade Gorton,* Attorney General, and *James M. Johnson,* Assistant Attorney General.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The appellants, husband and wife, are Indians. They were convicted in the Superior Court of the State of Washington [1] of the offenses of hunting and possession

---

*Solicitor General Bork, Assistant Attorney General Johnson, Louis F. Claiborne, Harry R. Sachse,* and *Edmund B. Clark* filed a brief for the United States as *amicus curiae* urging reversal.

[1] The appellant husband is an enrolled member of the Confederated Tribes of the Colville Indian Reservation. Tribes that formed the Confederated Tribes included the Colville, Columbia, San Poil, Okanogan, Nez Perce, Lake, Spokane, and Coeur d'Alene. Appellant wife is a Canadian Indian and is not enrolled in the United States. We do not deal, however, with whether her case

of deer during closed season in violation of Wash. Rev. Code §§ 77.16.020 and 77.16.030 (1974).[2] The offenses occurred on September 11, 1971, in Ferry County on un-allotted non-Indian land in what was once the north half of the Colville Indian Reservation.[3] The Colville Confederated Tribes ceded to the United States that northern half under a congressionally ratified and adopted Agreement, dated May 9, 1891. Article 6 of that ratified Agreement provided expressly that "the right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged."[4] Appellants' defense was that con-

is for that reason distinguishable from her husband's since the State Supreme Court drew no distinction between them. Moreover, appellee State conceded at oral argument in this Court that reversal of the husband's conviction would require reversal of the wife's conviction. Tr. of Oral Arg. 22.

[2] Washington Rev. Code § 77.16.020 provides in pertinent part:

"It shall be unlawful for any person to hunt . . . game animals . . . during the respective closed seasons therefor. . . .

"Any person who hunts . . . deer in violation of this section is guilty of a gross misdemeanor . . . ."

Section 77.16.030 provides in pertinent part:

"It shall be unlawful for any person to have in his possession . . . any . . . game animal . . . during the closed season . . .

"Any person who has in his possession . . . any . . . deer . . . in violation of the foregoing portion of this section is guilty of a gross misdemeanor . . . ."

[3] The original reservation was over 3 million acres "bounded on the east and south by the Columbia River, on the west by the Okanagan River, and on the north by the British possessions." Exec. Order of July 2, 1872; 1 C. Kappler, Indian Affairs, Laws and Treaties 916 (2d ed. 1904); see also *Seymour* v. *Superintendent,* 368 U. S. 351, 354 (1962).

[4] Article 6 provided in full:

"It is stipulated and agreed that the lands to be allotted as aforesaid to said Indians and the improvements thereon shall not be subject, within the limitations prescribed by law, to taxation for any purpose, national, state or municipal; that said Indians shall enjoy

gressional approval of Art. 6 excluded from the cession and retained and preserved for the Confederated Tribes the exclusive, absolute, and unrestricted rights to hunt and fish that had been part of the Indians' larger rights in the ceded portion of the reservation, thus limiting governmental regulation of the rights to federal regulation and precluding application to them of Wash. Rev. Code §§ 77.16.020 and 77.16.030. The Supreme Court of Washington-held that the Superior Court had properly rejected this defense and affirmed the convictions, 82 Wash. 2d 440, 511 P. 2d 1351 (1973). We noted probable jurisdiction, 417 U. S. 966 (1974). We reverse.

## I

President Grant established the original Colville Indian Reservation by Executive Order of July 2, 1872. Washington became a State in 1889, 26 Stat. 1552, and the next year, by the Act of Aug. 19, 1890, 26 Stat. 355, Congress created the Commission that negotiated the 1891 Agreement.[5] By its terms, the Tribes ceded the

without let or hindrance the right at all times freely to use all water power and water courses belonging to or connected with the lands to be so allotted, and that the right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged."

The status of the southern half of the Colville Reservation was considered in *Seymour* v. *Superintendent, supra.* At issue in this case are the residual rights to hunt and fish on the northern half preserved by the above Art. 6.

[5] The Colville Indian Commission was composed of Chairman Fullerton and Commissioners Durfur and Payne. The Commission first met on May 7, 1891, with representatives of the Confederated Tribes at Nespelem, Wash., on the reservation to discuss "a sale of a part of Reservation. . . ." During succeeding days, Ko-Mo-Del-Kiah, Chief of the San Poil, strongly opposed the sale of any part of the reservation, but Antoine, Chief of the Okanogan and great-grandfather of appellant Alexander Antoine, Moses, Chief of the Columbia, and Joseph, Chief of the Nez Perce, favored the

northern half of the reservation in return for benefits which included the stipulations of Art. 6 and the promise of the United States to pay $1,500,000 in five installments. The Agreement was to become effective, however, only "from and after its approval by Congress." Congressional approval was given in a series of statutes. The first statute was the Act of July 1, 1892, 27 Stat. 62, which "vacated and restored [the tract] to the public domain . . . ," and "open[ed] . . . [it] to settlement . . . ." The second statute came 14 years later, the Act of June 21, 1906, 34 Stat. 325, 377–378. That statute in terms "carr[ied] into effect the agreement," and authorized the appropriation of the $1,500,000. Payment of the $1,500,000 was effected by five subsequent enactments from 1907 to 1911, each of which appropriated $300,000 and recited in substantially identical language that it was part payment "to the Indians on the Colville Reservation, Washington, for the cession of land opened to settlement by the Act of July first, eighteen hundred and ninety-two . . . being a part of the full sum set aside and held in the Treasury of the United States in payment for said land under the terms of the Act of June twenty-first, nineteen hundred and six, *ratifying the agreement* ceding said land to the United States under date of May ninth, eighteen hundred and ninety-one . . . ." (Emphasis supplied.) 34 Stat. 1015, 1050–1051 (1907); 35 Stat. 70, 96 (1908); 35 Stat. 781, 813 (1909); 36 Stat. 269, 286 (1910); 36 Stat. 1058, 1075 (1911).[6]

---

proposed 1891 Agreement as fair. At a later meeting on May 23 at Marcus on the reservation, Barnaby, Chief of the Colville, and the Chief of the Lake agreed to the proposed sale. Minutes of Colville Indian Commission Concerning Negotiation for the 1891 Agreement of Sale, National Archives Document 21167.

[6] The delay in approval was occasioned by the initial reluctance of the House to ratify the Agreement without certain changes, 23

The canon of construction applied over a century and a half by this Court is that the wording of treaties and statutes ratifying agreements with the Indians is not to be construed to their prejudice. *Worcester* v. *Georgia,* 6 Pet. 515 (1832). See also *The Kansas Indians,* 5 Wall. 737, 760 (1867); *United States* v. *Kagama,* 118 U. S. 375

---

Cong. Rec. 3840 (1892), and by doubts raised in the Senate whether the Indians had title to the reservation, since it was created by Executive Order. See S. Rep. No. 664, 52d Cong., 1st Sess., 2 (1892). The Interior Department reported some years later that the doubts were unfounded. S. Rep. No. 2561, 59th Cong., 1st Sess., 137, 139 (1906). A bill passed by the House in 1891 replaced the $1,500,000 lump sum with a payment of $1.25 per acre, to be paid from the proceeds of sales of land opened for homesteading. The Senate disagreed, however, and passed a bill that ultimately became the Act of July 1, 1892. That Act makes no mention either of the consideration to be paid, or of the hunting and fishing rights preserved. Many protests were thereupon made that Congress had failed to live up to the terms of the Agreement. These included protests from the Department of the Interior, S. Rep. No. 2561, *supra,* at 137, 139, and from Chairman Fullerton, who had become Chief Justice of the Supreme Court of Washington. In a letter, *id.,* at 140, the Chief Justice said:

"It may be that my relations to this transaction have somewhat warped my judgment, but when I recall the impassioned appeals made by some of the aged members of these remnant bands, calling upon their people and upon the heads of the tribes not to sign away their lands, even though the compensation offered was ample, on the ground that it was their last heritage and their last tie to earth, I can not help a feeling of bitterness when I remember that the Government, whom we represented to them as being just and honorable, took away their land without even the solace of compensation."

The many protests finally bore fruit and Congress enacted the Act of June 21, 1906, and the five subsequent installment Acts. The Colville claims required the services of 16 lawyers from the States of Washington, Pennsylvania, and Georgia, and the District of Columbia. They recovered judgments against the United States for their services in the Court of Claims. *Butler and Vale* v. *United States,* 43 Ct. Cl. 497 (1908).

(1886); *Choctaw Nation* v. *United States,* 119 U. S. 1, 28 (1886); *United States* v. *Winans,* 198 U. S. 371, 380–381 (1905); *Choate* v. *Trapp,* 224 U. S. 665, 675 (1912); *Menominee Tribe* v. *United States,* 391 U. S. 404, 406 n. 2 (1968). In *Choate* v. *Trapp, supra,* also a case involving a ratifying statute, the Court stated: "The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." 224 U. S., at 675. See also *Seminole Nation* v. *United States,* 316 U. S. 286, 296 (1942); *Morton* v. *Ruiz,* 415 U. S. 199, 236 (1974). Thus, even if there were doubt, and there is none, that the words "[t]o carry into effect the [1891] agreement," in the 1906 Act, and the words "ratifying the [1891] agreement," in the 1907–1911 laws, ratified Art. 6, application of this canon would require that we construe the series of statutes as having ratified that article.

## II

Although admitted to statehood two years earlier, the State of Washington was not a party to the 1891 Agreement. The opinion of the State Supreme Court relies upon that fact to attempt a distinction for purposes of the Supremacy Clause [7] between the binding result upon

---

[7] Article VI, cl. 2, of the Constitution, the Supremacy Clause, provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

the State of ratification of a contract by *treaty* effected by concurrence of two-thirds of the Senate, Art. II, § 2, cl. 2, and the binding result of ratification of a contract effected by legislation passed by the House and the Senate. The opinion states that "[o]nce ratified, a *treaty* becomes the supreme law of the land" (emphasis supplied), but that the ratified 1891 Agreement was a mere contract enforceable "only against those party to it," and "not a treaty . . . [and] not the supreme law of the land." 82 Wash. 2d, at 444, 451, 511 P. 2d, at 1354, 1358. The grounds of this attempted distinction do not clearly emerge from the opinion. The opinion states, however: "The statutes enacted by Congress in implementation of this [1891] agreement . . . are the supreme law if they are within the power of the Congress to enact . . . ." *Id.*, at 451, 511 P. 2d, at 1358. In the context of the discussion in the opinion we take this to mean that the Congress is not constitutionally empowered to inhibit a State's exercise of its police power by legislation ratifying a contract between the Executive Branch and an Indian tribe to which the State is not a party. The fallacy in that proposition is that a legislated ratification of an agreement between the Executive Branch and an Indian tribe is a "[Law] of the United States . . . made in Pursuance" of the Constitution and, therefore, like "all Treaties made," is made binding upon affected States by the Supremacy Clause.

The opinion seems to find support for the attempted distinction in the fact that, in 1891, the Executive Branch was not authorized to contract by treaty with Indian tribes as sovereign and independent nations. *Id.*, at 444, 511 P. 2d, at 1354. Twenty years earlier, in 1871, 16 Stat. 544, 566, Congress had forbidden thereafter recognition of Indian nations and tribes as sovereign independent nations, and thus had abrogated the con-

tract-by-treaty method of dealing with Indian tribes.[8] The Act of 1871 resulted from the opposition of the House of Representatives to its practical exclusion from any policy role in Indian affairs. For nearly a century the Executive Branch made treaty arrangements with the Indians "by and with the Advice and Consent of the Senate," Art. II, § 2, cl. 2. Although the House appropriated money to carry out these treaties, it had no voice in the development of substantive Indian policy reflected in them. House resentment first resulted in legislation in 1867 repealing "all laws allowing the President, the Secretary of the Interior, or the commissioner of Indian affairs to enter into treaties with any Indian tribes," Act of Mar. 29, 1867, 15 Stat. 7, 9, but this was repealed a few months later, Act of July 20, 1867, 15 Stat. 18. After further unsuccessful House attempts to enter the field of federal Indian policy, the House refused to grant funds to carry out new treaties. United States Department of the Interior, Federal Indian Law 211 (1958). Finally, the Senate capitulated and joined the House in passage of the 1871 Act as a rider to the Indian Appropriation Act of 1871. Federal Indian Law, *supra,* at 138.[9]

---

[8] The Act of Mar. 3, 1871, 16 Stat. 544, 566, now codified as 25 U. S. C. § 71, provides:

"No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired."

[9] Former Commissioner of Indian Affairs Walker summarized the struggle as follows:

"In 1871, however, the insolence of conscious strength, and the growing jealousy of the House of Representatives towards the prerogative—arrogated by the Senate—of determining, in connection with the executive, all questions of Indian right and title, and of committing the United States incidentally to pecuniary obligations

This meant no more, however, than that after 1871 relations with Indians would be governed by Acts of Congress and not by treaty. *Elk* v. *Wilkins,* 112 U. S. 94 (1884); *In re Heff,* 197 U. S. 488 (1905). The change in no way affected Congress' plenary powers to *legislate* on problems of Indians, including legislating the ratification of contracts of the Executive Branch with Indian tribes to which affected States were not parties. Several decisions of this Court have long settled that proposition. In *Choate* v. *Trapp,* 224 U. S. 665 (1912), the Court held that tax exemptions contained in an 1897 agreement ratified by Congress between the United States and Indian tribes as part of a cession of Indian lands were enforceable against the State of Oklahoma, which was not a party to the agreement. In *Perrin* v. *United States,* 232 U. S. 478 (1914), the Court enforced a clause of an agreement ratified by Act of Congress that no intoxicating liquor should be sold on land in South Dakota ceded and relinquished to the United States, although South Dakota was not a party to the agreement. The Court expressly rejected the contention that the power to regulate the sale of intoxicating liquors upon all ceded lands rested exclusively in the State. Rather, because Congress was empowered, when securing the cession of part of an Indian reservation within a State, to prohibit the sale of intoxicants upon the ceded lands, "it follows that the State possesses no exclusive control over the subject and that the congressional prohibition is supreme." *Id.,* at 483. See also *Dick* v. *United States,*

---

limited only by its own discretion, for which the House should be bound to make provision without inquiry, led to the adoption, after several severe parliamentary struggles, of the declaration . . . that 'hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power, with whom the United States may contract by treaty.' " Federal Indian Law 211–212, citing F. Walker, The Indian Question (1874).

208 U. S. 340 (1908). These decisions sustained the ratified agreements as the exercise by Congress of its "plenary power . . . to deal with the special problems of Indians [that] is drawn both explicitly and implicitly from the Constitution itself. Article I, § 8, cl. 3, provides Congress with the power to 'regulate Commerce . . . with the Indian Tribes,' and thus, to this extent, singles Indians out as a proper subject for separate legislation." *Morton* v. *Mancari*, 417 U. S. 535, 551–552 (1974); see also *Morton* v. *Ruiz*, 415 U. S., at 236.

Once ratified by Act of Congress, the provisions of the agreements become law, and like treaties, the supreme law of the land. Congress could constitutionally have terminated the northern half of the Colville Indian Reservation on the terms and conditions in the 1891 Agreement, even if that Agreement had never been made. *Mattz* v. *Arnett*, 412 U. S. 481 (1973). The decisions in *Choate, Perrin,* and *Dick, supra,* settle that Congress, by its legislation ratifying the 1891 Agreement, constituted those provisions, including Art. 6, "Laws of the United States . . . made in Pursuance" of the Constitution, and the supreme law of the land, "superior and paramount to the authority of any State within whose limits are Indian tribes." *Dick* v. *United States, supra,* at 353.[10]

## III

The opinion of the State Supreme Court also holds that in any event the implementing statutes cannot be

---

[10] Washington Rev. Code § 37.12.060, which assumes limited jurisdiction over Indians, expressly provides that the law shall not deprive any Indian of rights secured by agreement.

"Nothing in this chapter . . . shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under federal treaty, *agreement*, statute, or executive order with respect to Indian land grants, hunting, trapping, or fishing or the control, licensing, or regulation thereof." (Emphasis added.)

construed to render Wash. Rev. Code §§ 77.16.020 and 77.16.030 inapplicable to Indian beneficiaries of the Agreement since the implementing statutes "make no reference to the provision [Art. 6] relied upon by the appellants." 82 Wash. 2d, at 451, 511 P. 2d, at 1358. The opinion reasons: "[I]f it was thought that state regulation but not federal regulation would constitute an abridgement, an express provision to that effect should have been inserted, but only after the consent of the state had been sought and obtained." *Id.*, at 448, 511 P. 2d, at 1357. This reasoning is fatally flawed. The proper inquiry is not whether the State was or should have been a consenting party to the 1891 Agreement, but whether appellants acquired federally guaranteed rights by congressional ratification of the Agreement. Plainly appellants acquired such rights. Congress exercised its plenary constitutional powers to legislate those federally protected rights into law in enacting the implementing statutes that ratified the Agreement. No congressional purpose to subject the preserved rights to state regulation is to be found in the Acts or their legislative history. Rather, the implementing statutes unqualifiedly, "carr[ied] into effect" and "ratif[ied]" the explicit and unqualified provision of Art. 6 that "the right to hunt and fish . . . shall not be taken away or in anywise abridged." State qualification of the rights is therefore precluded by force of the Supremacy Clause, and neither an express provision precluding state qualification nor the consent of the State was required to achieve that result.

IV

Finally, the opinion of the State Supreme Court construes Art. 6 as merely a promise by the United States that so long as it retained any ceded land and allowed others to hunt thereon, Indians would be allowed also to

hunt there. 82 Wash. 2d, at 449–450, 511 P. 2d, at 1357–1358. But the provision of Art. 6 that the preserved rights are not exclusive and are to be enjoyed "in common with all other persons," does not support that interpretation or affect the Supremacy Clause's preclusion of qualifying state regulation. Non-Indians are, of course, not beneficiaries of the preserved rights, and the State remains wholly free to prohibit or regulate non-Indian hunting and fishing. The ratifying legislation must be construed to exempt the Indians' preserved rights from like state regulation, however, else Congress preserved nothing which the Indians would not have had without that legislation. For consistency with the canon that the wording is not to be construed to the prejudice of the Indians makes it impermissible in the absence of explicit congressional expression, to construe the implementing Acts as "an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." *United States* v. *Winans*, 198 U. S., at 380; *Puyallup Tribe* v. *Department of Game (Puyallup I)*, 391 U. S. 392, 397–398 (1968). *Winans* involved a treaty that reserved to the Indians in the area ceded to the United States "the right of taking fish at all usual and accustomed places, in common with citizens of the Territory." 198 U. S., at 378. *Puyallup I* considered a provision that "[t]he right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory . . . ." 391 U. S., at 395. The Court held that rights so preserved "may, of course, not be qualified by the State . . . ." *Id.*, at 398; 198 U. S., at 384. Article 6 presents an even stronger case since Congress' ratification of it included the flat prohibition that the right "shall not be taken away or in anywise abridged."

## V

In *Puyallup I, supra,* at 398, we held that although, these rights "may . . . not be qualified by the State, . . . the manner of fishing [and hunting], the size of the take, the restriction of commercial fishing [and hunting], and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." The "appropriate standards" requirement means that the State must demonstrate that its regulation is a reasonable and necessary conservation measure, *Washington Game Dept.* v. *Puyallup Tribe,* 414 U. S. 44 (1973); *Tulee* v. *Washington,* 315 U. S. 681, 684 (1942), *and* that its application to the Indians is necessary in the interest of conservation.

The United States as *amicus curiae* invites the Court to announce that state restrictions "cannot abridge the Indians' federally protected rights without [the State's] demonstrating a compelling need" in the interest of conservation. Brief for United States as *Amicus Curiae* 16. We have no occasion in this case to address this question. The State of Washington has not argued, let alone established, that applying the ban on out-of-season hunting of deer by the Indians on the land in question is in any way necessary or even useful for the conservation of deer. See *Hunt* v. *United States,* 278 U. S. 96 (1928).[11]

---

[11] Appellants apparently claim no right to hunt on fenced private property. The State Supreme Court stated:

"Counsel . . . conceded in oral argument that the present owners of land in the northern half of the reservation have the right to fence their land and exclude hunters. Nevertheless they maintain that state regulation of the right to hunt is an abridgment of that right . . . ." 82 Wash. 2d 440, 448, 511 P. 2d 1351, 1356 (1973).

A claim of entitlement to hunt on fenced or posted private land

The judgment of the Supreme Court of the State of Washington sustaining appellants' convictions is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS, concurring.

I agree with the opinion of the Court that Congress ratified the cession Agreement together with all the rights secured by the Indians, thus putting the Agreement under the umbrella of the Supremacy Clause.

In 1872 President Grant, by Executive Order,[1] established a reservation for Indian tribes which came to be known as the Colville Confederated Tribes. By the Act of Aug. 19, 1890,[2] a Commission was appointed by the President to negotiate with the Tribes for "the cession of such portion of said reservation as said Indians may be willing to dispose of . . . ." On May 9, 1891, the Commission entered into an Agreement with the Tribes by which the latter ceded to the United States "all their right, title, claim and interest in" a tract of land constituting approximately the northern half of the reservation. Article 6 of the Agreement, however, provided that "the *right to hunt* and fish *in common with* all other persons on lands not allotted to said Indians *shall not be taken away or in anywise abridged.*" (Italics added.)

In 1892 the Congress passed an Act restoring the northern tract to the public domain and opening it to settlement.[3] The Agreement had promised the Indians

without prior permission of the owner would raise serious questions not presented in this case.

[1] Exec. Order of July 2, 1872; 1 C. Kappler, Indian Affairs, Laws and Treaties 916 (2d ed. 1904).

[2] 26 Stat. 355.

[3] 27 Stat. 62.

payment of $1,500,000 in cash by installments. The 1892 Act made no reference to this promise or to the rights to fish and hunt. Therefore there was agitation for further action by Congress. In 1906 and succeeding years, Congress eventually acted, authorizing and appropriating the money in five installments.[4] Each Act is essentially the same, appropriating the sum of $300,000:

> "In part payment to the Indians residing on the Colville Reservation for the cession by said Indians to the United States of one million five hundred thousand acres of land opened to settlement by [the 1892 Act], . . . being a part of the full sum set aside . . . in payment for said land under the terms of the Act approved June twenty-first, nineteen hundred and six, *ratifying the agreement ceding said land to the United States* under date of May ninth, eighteen hundred and ninety-one . . . ."[5] (Italics added.)

The Agreement and its ratification were made after the practice of making treaties with Indian tribes ended.[6] Yet "the Laws of the United States" as well as "all Treaties" are covered by the Supremacy Clause of the Constitution, Art. VI, cl. 2. We so held recently in

---

[4] The authorization appears at 34 Stat. 325, 377–378. The appropriations appear at 34 Stat. 1015, 1050–1051; 35 Stat. 70, 96, 781, 813; 36 Stat. 269, 286, 1058, 1075.

[5] The quoted language is from the 1907 Appropriations Act, 34 Stat. 1050–1051.

[6] See Act of Mar. 3, 1871, 16 Stat. 544, 566, now codified as 25 U. S. C. § 71:

"No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be invalidated or impaired."

*Morton* v. *Mancari,* 417 U. S. 535 (1974); *Morton* v. *Ruiz,* 415 U. S. 199 (1974). And see *Choate* v. *Trapp,* 224 U. S. 665 (1912); *Perrin* v. *United States,* 232 U. S. 478 (1914).

The pressures on Congress to live up to its Agreement were great and are discussed in S. Rep. No. 2561, 59th Cong., 1st Sess., 134–140 (1906). Would Congress stand by the "Agreement" of 1891? The head of the Commission that negotiated the Agreement with the Indians was Mark A. Fullerton, who in 1904 was Chief Justice of the Supreme Court of Washington. He stated his views:

> "I can not understand why the right of the Indians to this land is not just as sacred as it would have been had it been awarded to them under the most solemn treaty. When they entered upon the reservation they gave up forever land to which they had title as absolute as any band of Indians ever had to any land; and even though the exchange was a forced one, yet exchange it was, and the Government was, under its promise, as I believe, in all honor and right bound to respect it as an exchange and protect the Indians in their title accordingly. Legally, therefore, I can see no difference between the rights of these Indians to compensation for the land taken and the rights of the Puyallup, the Wyakimas, and the Nez Perces to the lands on their reservations which the Government has taken, and which the right to compensation was not even questioned; and, morally, certainly it would be hard to make a distinction.

> "It may be that my relations to this transaction have somewhat warped my judgment, but when I recall the impassioned appeals made by some of the aged members of these remnant bands, calling upon their people and upon the heads of the tribes not

to sign away their lands, even though the compensation offered was ample, on the ground that it was their last heritage and their last tie to earth, I can not help a feeling of bitterness when I remember that the Government, whom we represented to them as being just and honorable, took away their land without even the solace of compensation." [7]

The "right to hunt and fish in common with all other persons on lands not allotted to said Indians" plainly covers land ceded and held as public lands and also land ceded and taken up by homesteaders, for the reservation of the "right" contains no exception. As to all such lands the 1891 Agreement seems clear—the hunting and fishing right "shall not be taken away or in anywise abridged." As the Solicitor General says, that is "strong language." It has long been settled that a grant of rights—in the first case, fishing rights—on an equal footing with citizens of the United States would not be construed as a grant only of such rights as other inhabitants had. As stated in *United States* v. *Winans,* 198 U. S. 371, 380 (1905) : "This is certainly an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." That was our view in *Puyallup Tribe* v. *Department of Game,* 391 U. S. 392 (1968). A "right" which the Federal Government grants an Indian may "not be qualified or conditioned by the State," *id.,* at 399.

I agree with the Court that conservation measures, applicable to all, are available to the State, *id.,* at 398–403; but discrimination against the Indians by conservation measures is not permissible, *Washington Game Dept.* v. *Puyallup Tribe,* 414 U. S. 44, 48 (1973). In any event no conservation interest has been tendered here.

[7] S. Rep. No. 2561, 59th Cong., 1st Sess., 140 (1906).

212

The record in this case is devoid of any findings as to conservation needs or conservation methods. The State boldly claims that its power to exact a hunting license from all hunters qualifies even the Indians' right to hunt granted by Congress, irrespective of any conservation need. A State may do that when it comes to non-Indians or to Indians with no federal hunting rights, *Lacoste* v. *Department of Conservation,* 263 U. S. 545, 549 (1924). But Indians with federal hunting "rights" are quite different.

An effort is made to restrict these hunting rights to public lands, not to tracts ceded by this Agreement and taken up by private parties. The Agreement, however, speaks only of the ceded tract, not the ultimate disposition of the several parts of it. We would strain hard to find an implied exception for parcels in the ceded tract that ended in private ownership. The general rule of construction governing contracts or agreements with Indians is apt here:

> "The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years . . . ." *Choate* v. *Trapp,* 224 U. S., at 675.

Whether the result would be different if the contest were between the owner of the private tract and the Indian is a question that need not be reached. We have here only an issue involving the power of a State to impose a regulatory restraint upon a right which Congress bestowed on these Indians. Such an assertion of state power must fall by reason of the Supremacy Clause.

MR. JUSTICE REHNQUIST, with whom MR. JUSTICE STEWART joins, dissenting.

I do not agree with the Court's conclusion, *ante,* at 198, that "[c]ongressional approval was given" to the provisions of Art. 6 of the Agreement of May 9, 1891.

The Supremacy Clause of the Constitution specifies both "Laws" and "Treaties" as enactments which are the supreme law of the land, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." If the game laws enacted by the State of Washington, containing customary provisions respecting seasons in which deer may be hunted, are invalid under the Supremacy Clause, they must be so by virtue of either a treaty or a law enacted by Congress. Concededly the Agreement of 1891, between Commissioners appointed by the President and members of the Colville Confederated Tribes was not a treaty; it was not intended to be such, and Congress had explicitly provided 20 years earlier that Indian tribes were not to be considered as independent nations with which the United States could deal under the treaty power. Washington's game laws, therefore, can only be invalid by reason of some law enacted by Congress.

The Court's opinion refers us to the Act of Congress of June 21, 1906, which authorized monetary compensation to the Colvilles for the termination of the northern half of their reservation, and to a series of appropriation measures enacted during the following five years. There is, however, not one syllable in any of these Acts about Indian hunting or fishing rights, and it is fair to say that a member of Congress voting for or against them would not have had the remotest idea, even from the most careful of readings, that they would preserve Indian hunting and fishing rights. But because the language in the Act of 1906 states that it was enacted for the purpose of

"carrying out" the Agreement of 1891, and because language in subsequent appropriations Acts described the Act of 1906 as "ratifying" the Agreement of 1891, the Court concludes that Congress enacted as substantive law all 12 articles of the agreement.

The Court relies on three earlier decisions of this Court as settling the proposition that Congress could legislatively ratify the 1891 Agreement, and that once accomplished, the "legislation ratifying the 1891 Agreement, constituted those provisions . . . 'Laws of the United States . . . in Pursuance' of the Constitution, and the supreme law of the land." *Ante,* at 204. Congress *could* undoubtedly have enacted the provisions of the 1891 Agreement, but the critical question is whether it *did* so. Far from supporting the result reached by the Court in this case, the decisions of this Court in *Choate* v. *Trapp,* 224 U. S. 665 (1912), *Perrin* v. *United States,* 232 U. S. 478 (1914), and *Dick* v. *United States,* 208 U. S. 340 (1908), show instead how virtually devoid of support in either precedent or reason that result is.

Each of those cases did involve an agreement negotiated between Commissioners representing the United States and Indian bands and tribes. Each of the agreements was held to have been ratified by Congress, and its substantive provisions to have thereby been made law. But the contrast with the manner in which Congress accomplished ratification in those cases, and the manner in which it acted in this case, is great indeed.

*Choate* involved the Atoka Agreement negotiated between the Dawes Commission and Choctaw and Chickasaw representatives in 1897. The following year, Congress enacted the Curtis Act, 30 Stat. 495, the relevant provisions of § 29 of which are as follows:

> "That the agreement made by the Commission to the Five Civilized Tribes with commissions repre-

senting the Choctaw and Chickasaw tribes of Indians on the twenty-third day of April, eighteen hundred and ninety-seven, as herein amended, is hereby ratified and confirmed . . . ."   30 Stat. 505.

The section then proceeds to set out *in haec verba* the full text of the Atoka Agreement.

*Perrin* v. *United States, supra,* involved the sale of liquor on ceded land, contrary to a prohibition contained in the cession agreement negotiated with the Sioux Indians in December 1892.   That agreement was ratified by Congress in an Act of Aug. 15, 1894, 28 Stat. 286, 314, in which Congress used much the same method as it had employed in *Choate:*

"SEC. 12.   The following agreement, made by . . . is hereby accepted, ratified, and confirmed."

Then followed, within the text of the Act of Congress itself, the articles of agreement *in haec verba.*   Likewise, ratification of the agreement involved in *Dick, supra,* was accomplished by explicit statutory language and *in haec verba* incorporation of the articles of agreement.

The Court today treats the Act of June 21, 1906, as simply another one of these instances in which Congress exercised its power to elevate mere agreements into the supreme law of the land.   But it has done so with little attention to the critical issue, that of whether Congress actually exercised this power.   Whereas the exercise was manifest in *Choate, Perrin,* and *Dick,* it is evidenced in the present case by nothing more than little scraps of language, ambiguous at best, in several Acts of Congress which contain not a word of the language of Art. 6 of the 1891 Agreement.   I think consideration of all of the legislative materials, including the actual language used by Congress on the occasions when it spoke, rather than the elided excerpts relied upon by the Court, show that there was no ratification of Art. 6.

The original Colville Reservation was created by Executive Order in 1872. It consisted of over three million acres lying between the Okanogan and Columbia Rivers in the northern part of the State of Washington. In 1890 Congress created a Commission to "negotiate with said Colville and other bands of Indians on said reservation for the cession of such portion of said reservation as said Indians may be willing to dispose of, that the same may be open to white settlement." 26 Stat. 336, 355. The following year Commissioners appointed by the President met with representatives of the Colville Confederated Tribes. The Agreement of May 9, 1891, was executed to "go into effect from and after its approval by Congress."

Article 1 of the Agreement provided that the northern half of the Colville Reservation, as it existed under the Executive Order of 1872, should be vacated. Article 5 provided that "in consideration of the cession surrender and relinquishment to the United States" of the northern half of the reservation, the United States would pay to the members of the tribe the sum of $1,500,000. Article 6, quoted in the opinion of the Court, contained provisions respecting tax exemption and Indian hunting and fishing rights.

The Agreement was presented to the 52d Congress for ratification, but that body adamantly refused to approve it. The characterization in the Court's opinion of the Act of July 1, 1892, 27 Stat. 62, as the "first" in a series of statutes in which congressional approval was given to the Agreement of May 9, 1891, is a bit of historical legerdemain. Doubts were expressed as to whether the Indians had title to the reservation, since it had been created by Executive Order, thus again highlighting disagreement between the Executive and Legislative Branches as to how best to deal with the Indian tribes.

The Act of July 1, 1892, vacated the northern half of the Colville Reservation, as it had been established by President Grant, "notwithstanding any executive order or other proceeding whereby the same was set apart as a reservation for any Indians or bands of Indians," and declared that "the same shall be open to settlement and entry by the proclamation of the President of the United States and shall be disposed of under the general laws applicable to the disposition of public lands in the State of Washington." 27 Stat. 63. Section 4 of the Act tracked Art. 2 of the agreement, providing that each Indian then residing on the ceded portion of the reservation should be entitled to select 80 acres of the ceded land to be allotted to him in severalty. Section 5 of the Act tracked Art. 3 of the agreement, providing that Indians then residing in the ceded portion of the reservation should have a right to occupy and reside on its remaining parts, if they chose that in preference to receiving an allotment. Section 6 of the Act tracked Art. 4 of the agreement, and concerned various school and mill sites within the ceded portion.

But conspicuous by their absence from the Act of July 1, 1892, were any provision for the payment of the $1,500,-000, and any reference whatsoever to the Agreement's provisions dealing with hunting and fishing. rights and immunity from taxation. Far from being the "first" of a series of Acts ratifying the entirety of the 1891 Agreement, the Act provided, in § 8:

> "That nothing herein contained shall be construed as recognizing title or ownership of said Indians to any part of the said Colville Reservation, whether that hereby restored to the public domain or that still reserved by the Government for their use and occupancy." 27 Stat. 64.

The Act of July 1, 1892, became law without the sig-

nature of President Harrison. Members of the Colville Confederated Tribes became justifiably alarmed that it had terminated the northern half of the reservation without authorizing the compensation for which they had bargained. After a 14-year campaign, described in detail in the report of *Butler and Vale* v. *United States,* 43 Ct. Cl. 497 (1908), they obtained congressional relief. But the relief embodied in the statutes enacted in 1906 and subsequent years did not amount to a full adoption and ratification of the 1891 Agreement. Rather, the description of the efforts to obtain relief, as well as the legislation which resulted, demonstrates that the Indians were concerned only with the compensation promised by the 1891 Agreement, and not with whatever ancillary rights were accorded by its Art. 6.

The following excerpts from the Court of Claims opinion, which would appear to have the added authenticity that is given by contemporaneity, describe some of the events:

> "In pursuance of the [1891] agreement the lands so ceded were by act of Congress thrown open to public settlement; but no appropriation of money was made, *and that part of the agreement providing for its payment was never complied with until the passage of the act of June 21, 1906. The Indians became anxious* and, justly, quite solicitous Their appeals to the Congress subsequent to their agreement was met in 1892 by an adverse report from the Senate Committee on Indian Affairs, in which *their right to compensation as per agreement was directly challenged* by a most positive denial of their title to the lands in question.

> "In May, 1894, the said Colville Indians entered into a contract with Levi Maish, of Pennsylvania, and Hugh H. Gordon, of Georgia, attorneys and

counselors at law, by the terms of which *the said attorneys were to prosecute their said claim against the United States and receive as compensation therefor 15 per cent of whatever amount they might recover.* . . . Nothing was accomplished for the Indians under the Maish-Gordon contract. Notwithstanding its expiration, however, a number of attorneys claim to have rendered efficient services and to have accomplished, by the permission and authority of the Congress and the committees thereof, *the final compliance with the agreement of 1891 and secured by the act of June 21, 1906, an appropriation covering the money consideration mentioned in said agreement.*" 43 Ct. Cl., at 514–515 (emphasis added).

The agreement which formed the basis of the suit in *Butler and Vale* was, as just described, entered into between the Colvilles and two attorneys whom they retained to press their claim. It, too, recites that the Indians' concern was directed to the Government's failure to compensate them for the northern half of the reservation:

" 'And whereas the principal consideration to said Indians for the cession and surrender of said portion of the reservation was the express agreement upon the part of the United States Government to pay to said Indians 'the sum of one million five hundred thousand dollars ($1,500,000) . . . ;'

" 'And *whereas the United States Government has failed to comply with the terms of said agreement, and no provision has been made to pay said Indians* the amount stipulated in the said agreement for the cession of said lands;

" 'And whereas the said Indians entered into said agreement with an implicit trust in the good faith

of the United States Government, and now *most earnestly protest that their lands should not be taken from them without the payment of the just compensation stipulated in said agreement;*

.    .    .    .    .

" '. . . The purpose of this agreement is to secure the presentation and prosecution of the claims of said Indians *for payment for their interest in said ceded lands* and to secure the services of said Maish and Gordon as counsel and attorneys for the prosecution and collection of said claims.' " *Id.,* at 502 (emphasis added).

Similarly, the letter of protest by the Chairman of the Colville Indian Commission, *ante,* at 199 n. 6, focused solely on Congress' failure to provide the Indians "the solace of compensation."

As a result of the efforts of the Indians, their friends, and their attorneys, Congress ultimately acceded to their claim for compensation. It did so in the Act of June 21, 1906, which is the Indian Department Appropriations Act of 1906. With respect to the Colville Confederated Tribes, the Act provided as follows:

"To carry into effect the agreement bearing date May ninth, eighteen hundred and ninety-one, . . . there shall be set aside and held in the Treasury of the United States for the use and benefit of said Indians, which shall at all times be subject to the appropriation of Congress and payment to said Indians, in full payment for one million five hundred thousand [1,500,000] acres of land opened to settlement by the Act of Congress, . . . approved July first, eighteen hundred and ninety-two, the sum of one million five hundred thousand dollars [$1,500,000] . . . ." 34 Stat. 377–378.

This Act is surely the major recognition by Congress of the claims of the Colvilles, and even with the most liberal construction I do not see how it can be read to do more than authorize the appropriation of $1,500,000 to effectuate the compensation article of the 1891 Agreement. Not a word is said about tax exemption, nor about hunting and fishing rights.

The Court also relies on language in the Indian Department Appropriations Act of 1907, 34 Stat. 1015, and substantially identical language in each of the succeeding four annual Indian Department Appropriation Acts. After the usual language of appropriation, the Act goes on to provide:

> "In part payment to the Indians residing on the Colville Reservation for the cession by said Indians to the United States of one million five hundred thousand acres of land opened to settlement by an Act of Congress . . . approved July first, eighteen hundred and ninety-two, being a part of the full sum set aside and held in the Treasury of the United States in payment for said land under the terms of the Act approved June twenty-first, nineteen hundred and six, ratifying the agreement ceding said land to the United States under date of May ninth, eighteen hundred and ninety-one, three hundred thousand dollars . . . ." 34 Stat. 1050–1051.

Thus the Court rests its decision in this case on two legislative pronouncements. The first is the 1906 Act authorizing payment of money to the Colvilles and reciting that the authorization was made to "carry into effect" the 1891 Agreement. The second is the series of Acts appropriating funds to cover the 1906 authorization and referring to the authorization as "ratifying the agreement ceding said land." On the basis of these Acts, both of which are part of the mechanism by which Congress ex-

pends public funds, the Court has concluded that provisions of the 1891 agreement utterly unrelated to the payment of money became the supreme law of the land, even though there is no indication that the Colvilles sought any relief other than with respect to the Government's failure to pay compensation, or that Congress intended any relief affecting the *use* of land it quite plainly had determined should be returned to the public domain.

A far more reasoned interpretation of these legislative materials would begin by placing them in the context of the Executive/Legislative dispute over Indian policy and authority. A year after the signing of the 1891 Agreement, Congress clearly indicated its doubt as to whether President Grant was justified in setting aside three million acres for the Colvilles, and as to whether his Executive Order actually conveyed title. In the Act of July 1, 1892, Congress chose to take what the Indians had expressed a willingness to surrender, but to give only part of what the Commissioners had agreed the Government should give in return. The Colvilles, after a 14-year battle in and around the legislative halls of Congress, obtained the monetary relief which they sought. Sympathy with their plight should not lead us now to distort what is on its face no more than congressional response to demands for payment into congressional enactment of the entire 1891 agreement.

I would affirm the judgment of the Supreme Court of Washington.