**ALABAMA–COUSHATTA INDIAN TRIBE OF TEXAS, Plaintiff,**

v.

**Jim MATTOX, Attorney General of Texas; the Texas Indian Commission; Edd Fifer, Chairman of the Texas Indian Commission; Raymond Apodaca, Executive Director of the Texas Indian Commission; Owanah Anderson and Don Ellyson, Members of the Texas Indian Commission, Defendants.**

**Civ. No. A–84–CA–410.**

United States District Court,
W.D. Texas,
Austin Division.

July 21, 1986.

Alan H. Minter, Minter, Joseph, Thornhill, Austin, Tex., Don B. Miller, Native American Rights Fund, Boulder, Colo., Tom Diamond, Diamond, Rash, Leslie & Smith, El Paso, Tex., for plaintiff.

Lou Bright, Mitchell J. Green, Asst. Atty. Gen., Austin, Tex., for defendants.

## ORDER

NOWLIN, District Judge.

Before the Court are the Cross-Motions for Summary Judgment. The Court has considered the Motions of the parties, as well as the Amicus Curiae brief filed in support of the Plaintiff's Motion, and is of the opinion that the Plaintiff's Motion for Summary Judgment is meritorious and should be Granted and that the Defend-

ants' Motion for Summary Judgment is not meritorious and should be Denied.

## I. BACKGROUND

This suit was filed on July 13, 1984. It seeks declaration of the Plaintiff's rights under 25 U.S.C. § 721 (1954), an Act which terminated federal supervision of the Alabama and Coushatta Tribe of Texas. The suit alleges that the Texas Indian Commission abused its discretion when it refused to accept title to the land based upon an opinion of the Texas Attorney General. The land owned by the Tribe consists of two tracts: a 1,280 acre tract to which the Tribe holds restrictive title; and a 3,071 acre tract which is held in trust by the state for the benefit of the Tribe.

The 1,280 acre tract (the "State tract") was originally purchased by the State of Texas as a home for the Alabama-Coushatta Tribe. Title is held by the Indians but is restricted so that they cannot alienate, lease, rent, let or dispose of the land. In 1928 the federal government purchased an additional 3,071 acre tract (the "Federal tract") adjacent to the 1,280 acre tract for the Tribe. In 1953, the Texas State Legislature authorized the Governor to accept on behalf of the State the transfer of trust on the 3,071 acre tract of land. This action was done in anticipation of an Act of Congress which would terminate federal supervision of the Alabama-Coushatta Tribe. In 1954, Congress terminated federal supervision of the Tribe and transferred all trust responsibility for the Tribe to the State of Texas. 25 U.S.C. § 721 et seq. ("the 1954 Act"). Pursuant to an Act of the Texas Legislature, the Governor appointed the Texas State Hospitals and Special School Board as a State agency responsible for the trust. The Texas Indian Commission succeeded the Board and those responsibilities. Pursuant to the 1954 Act, the federal government conveyed the 3,071 acre tract to the State of Texas to be held in trust for the benefit of the Tribe. Title to the land is now held by the State of Texas. The 1954 Act authorized the Tribe to convey to the State of Texas the 1,280 acre tract

purchased or deeded to the Tribe by the State of Texas, and required that all of the land so conveyed should be held by the State of Texas in trust for the benefit of the members of the Tribe. The Tribe has not conveyed title to the 1,280 acre tract to the State of Texas as authorized by that Act.

On March 23, 1983, the Attorney General issued an opinion which concluded, among other things, that the restraints on alienation imposed on the 1,280 acre tract were unconstitutional and that the 1,280 acre tract did not constitute an Indian reservation; that the only status held by the Tribe was that of a private association; and that the trust assumed by the State of Texas on the 3,071 acre tract was dry, and therefore the tract was free of any legally meaningful designation as an "Indian reservation." The narrow question before the Attorney General was whether Texas Fish and Game laws could be enforced on the reservation. Unfortunately, the broad, sweeping conclusions of the opinion have fueled a malestrom of controversy. Based upon the opinion, the State Comptroller has questioned his authority to honor claims against state funds by the Texas Indian Commission relating to the expenses of the Alabama-Coushatta Indian reservation. Additionally, the Director of the Minerals Tax Division has ruled that oil and gas royalties being received by the Tribe from production on the 1,280 acre tract of land is subject to the State severance tax despite the fact that the State General Land Office together with the Texas Indian Commission administer and supervise oil and gas leasing on the reservation.

On June 25, 1984, the Tribe requested that the Texas Indian Commission accept in trust, title to the 1,280 acre tract as authorized by the 1954 Act of Congress. The Commission, relying exclusively on the Attorney General's opinion, declined to accept title to the 1,280 acre tract and hold it in trust for the benefit of the Tribe. Consequently, the Tribe has filed this suit seeking a declaration of their rights under the 1954 Act of Congress. Both sides have

filed Motions for Summary Judgment. The Tribe seeks a declaration that: (1) the 1954 Termination Act did not extinguish the Tribe's existence as a tribal government; (2) the pre–1954 relationship between the United States and the Tribe was based upon a political classification rather than upon an impermissible racial or national origin classification; (3) the State of Texas stepped into the shoes of the United States upon enactment of the 1954 Act and assumed all of the duties and responsibilities previously exercised by the United States; (4) the special relationship between the Tribe and the State is thus based upon that same political classification that underlies the federal trust relationship; (5) the Equal Rights Amendment to the Texas Constitution does not extinguish either the duties assumed by the State in 1954 or the pre-existing historical trust relationship between the State and the Tribe; (6) the trust assumed by the State in 1954 is not dry; and (7) the Texas Indian Commission violated federal law by refusing to accept the Tribe's offer of title in trust to the 1854 Reservation. In response to Plaintiff's Motion for Summary Judgment the State concedes that it has an obligation to hold title to the Federal tract, but denies any duty exists with respect to the State tract. The State claims that the 1954 Act imposed upon the State only the duty to hold technical title to the Federal tract to prevent piecemeal alienation; consequently, no other duties were assumed by the State. The response also fails to defend the State's previous position, as propounded by JM–17, that the Tribe is "merely an unincorporated association under Texas law, with the same legal status as other private associations." The State argues that though the State of Texas has a "federally-created" obligation to hold in trust title to the Federal tract, the State of Texas and the Texas Indian Commission do not have a federally-created obligation to hold in trust title to the State tract. The State argues that whether the State accepts a tender of title to this tract is a matter of state law. Finally, the State argues that pursuant to the provisions of 25 U.S.C. §§ 721 and 726, there is no feder-

ally-created impediment to the exercise by Texas of its fish and game laws on either the State or Federal tract.

The issues before the Court are whether a trust relationship exists between the Tribe and the State, and whether the 1954 Act imposes upon the State a duty to accept and hold title to the State tract. The Court is not asked, nor will it attempt, to define the entire scope of the State's responsibilities to the Tribe under the 1954 Act. The Court's opinion is limited to the two issues stated above. In order to determine these issues an analysis of the 1954 Act is required.

## II. THE 1954 TERMINATION ACT

The Alabama-Coushatta Termination Act was the result of a federal policy designed to relieve the federal government of its duty to supervise the lives and property of Indians. This "termination era," which spanned an entire decade, began in 1953 with passage of House Concurrent Resolution 108 on August 1, 1953. The Resolution declared

it is the policy of Congress, as rapidly as possible, to make the Indians within the territorial limits of the United States subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens of the United States, to end their status as wards of the United States, and to grant them all of the rights and prerogatives pertaining to American citizenship.

H.R.Con.Res. 108, 83d Cong., 1st Sess. (1953), 67 Stat. B132. Consistent with this intent, section 721 of the Act provides:

The Secretary of the Interior is authorized to convey to the State of Texas the lands held in trust by the United States for the tribe of Indians organized and known as the Alabama and Coushatta Tribes of Texas, located in Polk County, Texas; *and such tribe is authorized to convey to the State of Texas the lands purchased for and deeded to the Alabama Indians in accordance with an act of the legislature of the State of Texas approved February 3, 1854, locat-*

*ed in Polk County, Texas.* All of the lands so conveyed *shall* be held by the State of Texas in trust for the benefit of the Indians of the Alabama and Coushatta Tribes of Texas, subject to such conditions regarding management and use as the State of Texas may prescribe and the disposition of such lands shall be subject to approval of a majority of the adult members of the Alabama and Coushatta Tribes of Texas.

25 U.S.C. § 721. (Emphasis added). Section 722 provides for termination of the federal trust and further provides:

Thereafter such tribe and its members shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians: *Provided,* That after August 21, 1954 such Indians shall be eligible for admission, on the same terms that apply to other Indians, to hospitals and schools maintained by the United States.

*Id.* § 722. Sections 723 and 724 terminate the federal government's power over the Tribe and cancel any indebtedness of the Tribe to the United States. *Id.* §§ 723, 724. Section 726 addresses the applicability of federal and state law to the Tribe:

On or after the date of the proclamation to be issued in accordance with the provisions of section 722 of this title, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the Alabama and Coushatta Tribes of Texas or the members thereof, except as provided in said section and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.

*Id.* § 726.

### III. CONSTRUCTION OF THE ACT

▮ In construing the statute the Court must endeavor to give effect to the intent of Congress expressed within the statute. *South Carolina v. Catawba Indian Tribe,* —— U.S. ——, ——, 106 S.Ct. 2039, 2043, 90 L.Ed.2d 490 (1986); *DeCou-*

*teau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975). In order to accomplish this task the Court should accord the statutory language its plain and ordinary meaning. *South Carolina,* —— U.S. at ——, 106 S.Ct. at 2044. Further, it is appropriate to examine the legislative history and surrounding circumstances to aid in proper construction of the Act. *See Mattz v. Arnett,* 412 U.S. 481, 504–05, 93 S.Ct. 2245, 2257–58, 37 L.Ed.2d 92 (1973). Any doubtful expression of legislative intent must be resolved in favor of the Indians. *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975); *Antoine v. Washington,* 420 U.S. 194, 199–200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975); *Mattz,* 412 U.S. at 505, 93 S.Ct. at 2258.

▮ The State correctly concedes that the 1954 Act did not terminate the very existence of the Tribe or render it "merely an unincorporated association under Texas law, with the same legal status as other private associations." TEX. ATT'Y GEN. OP. NO. JM–17 (1983).

Termination legislation did not literally terminate the existence of the affected tribes. Further, its effect was not necessarily to terminate all of the federal government's relationship with those tribes. Tribal powers can be extinguished only by clear and specific congressional action. Indian tribes can be recognized by the United States for some purposes and not for others.

F. Cohen, *Handbook on Federal Indian Law* 815 (1982 ed.); *see Kimball v. Callahan,* 590 F.2d 768, 773–75 (9th Cir.1979). The 1954 Act contains no clear or specific provision which terminates the existence of the Tribe. Section 1 provides that the "lands ... shall be held by the State ... in trust for the Tribes...." 25 U.S.C. § 1 (1954). Section 2 provides that the Tribe *shall* be ineligible for federal Indian services, and section 3 provides for the continuation of tribal powers under its constitution and bylaws. *Id.* at §§ 2, 3. Finally, Section 6 proscribes future application of fed-

eral Indian statutes to the Tribe. The specific preservation of the Tribe's constitution and bylaws coupled with the frequent prospective references to the Tribe and its future relationship with the federal government and the State of Texas, demonstrate that Congress did not intend to terminate the existence of the Tribe but rather contemplated its ongoing existence.

■ The State further concedes it's obligation to hold the "Federal tract" in trust, but denies any duty to accept title to the "State tract" in trust. The State's position is clearly erroneous in light of the clear language of the 1954 Act. Section 721 authorizes the Tribe to convey to the State of Texas the "State tract." "All of the lands so conveyed *shall* be held by the State of Texas for the benefit of the Indians...." 25 U.S.C. § 721 (1954). Clearly, Congress intended that the State accept title to the tract if offered by the Tribe. If the Act imposed no duty upon the State to accept title, that portion of section 721 which allows the Tribe to convey title to the State would be meaningless. An elementary rule of statutory construction requires that effect be given to every word, clause and sentence of a statute. *United States v. Menasche,* 348 U.S. 528, 539, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955). This Court cannot presume that Congress engaged in a meaningless act by authorizing conveyance of the "State tract" to the State without imposing a corresponding duty upon the State to accept title to the tract in trust. Once tendered by the Tribe, the State must accept and hold the lands of the "State tract" in trust.

■ The legislative history of the 1954 Act supports this conclusion. The historical status of both tracts is significant in reading this conclusion. Indian lands are "subject to the legislation of Congress enacted in the exercise of the government's guardianship ..." over Indians and their lands. *United States v. Sandoval,* 231 U.S. 28, 48, 34 S.Ct. 1, 6, 58 L.Ed. 107

(1913). While fee title to Indian lands may well reside in a state, the federal government nevertheless possesses trust responsibility to that land. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974). Thus, prior to the effective date of the 1954 Act, the United States was the trustee of both tracts.[1] The legislative history of the 1954 Act indicates that following the purchase of the "Federal tract," both tracts were treated as a single reservation. *See* H.R. Rep. No. 2491, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad. News 3119, 3121 (App. B); Joint Hearings on S. 2744, Subcommittee on Interior and Insular Affairs, 83d Cong., 2d Sess. 108–23 (Feb. 16, 1954) (App. C). Between 1928 and 1954, a majority, if not all, of the administrative responsibilities for the tracts were assumed by the State of Texas. Joint Hearings, *supra* at 122–18. The legislative history of the 1954 Act further reveals that all of the concerned parties contemplated a complete transfer of trust responsibilities from the federal to the state government. H.R.Rep. No. 2491, 1954 U.S.Code Cong., *supra* at 3122 (App. B). Despite the transfer provision in section 721, there is no evidence that Congress intended to excuse the State's performance of trust duties toward the "State tract." In fact, testimony at hearings on the 1954 Act indicate that Congress contemplated creation of "one State trust reservation if this bill becomes law." *Id.* at 120, 129.

Moreover, the State understood that it was to serve as trustee for "one State trust reservation." Prior to enactment of the 1954 Act, the Texas Legislature accepted the federal trust responsibilities by concurrent resolution. *See* H.R.Rep. No. 2491, 1954 U.S.Code Cong., *supra* at 3122 (App. B). The resolution noted the legislature's desire to establish a policy "to achieve a stronger unity for the protection of interest and welfare of such Indian tribes ...," and authorized the Governor's acceptance on

---

**1.** The Indian Nonintercourse Act, 25 U.S.C. § 177, gave use to the federal trust responsibility for the "State tract" at least since its purchase

in 1854. *Id.; Lipan Apache Tribe v. United States,* 180 Ct.Cl. 487, 497–99 (1967).

behalf of the State "a transfer of the trust responsibilities of the United States respecting the lands and other assets of the [Tribe]...." *See id.* After enactment of the 1954 Act the State erected permanent improvements on the "State tract," provided state employees to manage the tract, and still supervises and manages oil and gas production on the "State tract." Royalties from this mineral production are deposited in a special fund in the State Treasury. The Texas Indian Commission must approve every expenditure of these funds. Tex.Rev.Civ.Stat.Ann. arts. 5382d & 5421z (App. E) (Vernon 1959). Consequently, this Court is of the opinion that the 1954 Act imposes upon the State a duty to accept and hold the lands of the "State tract" in trust once tendered by the Tribe.

■ The State next argues that the trust responsibilities transferred by the 1954 Act simply require that the state acquire and hold title to the tracts. The entire scope of the State's responsibilities to the Tribe under the 1954 Act is not before the Court. However, the Act clearly transfers to the State those trust duties assumed by the United States prior to enactment of the 1954 Act. The source of these duties are the Nonintercourse Act, 25 U.S.C. § 177, and the 1928 Act of Congress that authorized purchase of the "Federal tract." 45 Stat. 883, 900. The 1928 Act undertook improvement of the general welfare of the Tribe by provision for industrial and agricultural assistance, as well as provision for educational and health benefits. Clearly, the federal trust responsibilities passed on to the State encompass a wide range of duties, not merely the duty to hold title to the tracts. As interpreted by the Texas Legislature, the State has the duty to assist the Tribe's development of "the human and economic resources" of the Tribe, as well as development of the "health, educational, agricultural, business and industrial capacities" of the reservation. Tex.Rev.Civ.Stat.Ann. art. 5421z, § 7 (Vernon 1954). The Court is of the opinion that the trust duties imposed upon and accepted by the State through the 1954 Act extend beyond the requirement that the State accept title to the "State tract" in trust when tendered by the Tribe.

■ There is no merit to the State's argument that the Equal Footing Doctrine bars Texas' trust relationship with the Tribe. The United States Supreme Court rejected the equal footing doctrine as a limitation on Congress' plenary power of Indian affairs some eighty years ago. *United States v. Winters,* 207 U.S. 564, 577–78, 28 S.Ct. 207, 211–12, 52 L.Ed. 340 (1908); *United States v. Winans,* 198 U.S. 371, 382–84, 25 S.Ct. 662, 664–65, 49 L.Ed. 1089 (1905). States are not constitutionally precluded from involvement in Indian affairs. State action is only precluded when its involvement or exercise of jurisdiction conflicts with federal law or policy. *New York ex rel. Cutler v. Dibble,* 62 U.S. (21 How.) 366, 16 L.Ed. 149, (1859). Consequently, the supremacy clause, not the equal footing doctrine, determines whether state involvement in Indian affairs is precluded.

Since it is the Supremacy Clause which defeats the application of state laws to Indian matters, Congress can authorize state jurisdiction by superseding, repealing, or amending a preemptive treaty or statute. On occasion treaties or statutes have terminated federal protection over a tribe and its property. Many treaties and laws have provided for cession of tribal lands, which may then cease to be Indian country. Congress has also passed a number of specific statutes which apply state laws to Indian country or Indian property in particular circumstances. Some statutes apply state legislative standards only, such as the provision that incorporates the applicable state law to determine heirship, descent, and partition of allotted lands. Other laws, such as Public Law 280, delegate to certain states law enforcement jurisdiction over Indian country within the state. F. Cohen, *Handbook on Federal Indian Law 277* (1982 ed.) Congress may transfer its duties and jurisdiction to certain states while retaining jurisdiction in others.

*See* 18 U.S.C. § 1162; 25 U.S.C. §§ 1321–26; 28 U.S.C. § 1360; *Washington v. Yakima Indian Nation,* 439 U.S. 463, 479–82, 99 S.Ct. 740, 750–52, 58 L.Ed.2d 740 (1979); F. Cohen, *Handbook on Federal Indian Law* 344 (1982 ed.).

■ Finally, the Texas Equal Rights Amendment, Tex. Const. art. 1, § 3a, does not prohibit Texas' trust relationship with the Tribe. Even assuming that the 1954 Act is truly in conflict with the Texas Constitution, the Supremacy Clause of the United States Constitution requires that the provisions of the federal statute prevail. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *see* F. Cohen, *Handbook on Federal Indian Law 211* (1982 ed.); *see also Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 479–80, 96 S.Ct. 1634, 1644, 48 L.Ed.2d 96 (1976).

Further, the United States Constitution specifically allows "special treatment" of Indians. U.S. Const., art. I, sec. 8, cl. 3; art. II, sec. 2, cl. 2. Moreover, numerous cases have upheld state and federal laws which recognize Indians as a class for special treatment against attack on equal protection grounds. *Eg. Washington v. Fishing Vessel Ass'n,* 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068, n. 20 61 L.Ed.2d 823 (1979) (recognized status of Indians justifies special treatment); *United States v. Antelope,* 430 U.S. 641, 645–46, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977) ("such regulation is rooted in the unique status of Indians as a 'separate people' with their own political institutions"); *Morton v. Mancari,* 417 U.S. 535, 553, 94 S.Ct. 2474, 2484, 41 L.Ed.2d 290 (1974) (employment preferences not violative of equal protection clause).

■ The legislative history of the 1954 Act demonstrates that the relationship in existence prior to 1954 was based upon the Tribe's status as a separate political body and the federal government's obligations toward that body. The federal government's relationship with the Tribe was not based upon an impermissible racial classification. Consequently, when the State assumed the trust duties of the federal government its relationship with the Tribe is *ipso facto* based upon the Tribe's separate and unique political status. The Texas Constitution does not prohibit the unique political classification at issue in this case. *See Lincoln v. Mid-Cities Pee Wee Football Ass'n,* 576 S.W.2d 922, 925 (Tex.Civ. App.—Fort Worth 1979, no writ). Further, the State's long relationship with the Tribe is based upon a political relationship. The special benefits accorded the Tribe by the State over the years flow from the Indian tribal membership, not their race.

ACCORDINGLY, IT IS ORDERED, ADJUDGED AND DECREED that the Plaintiff's Motion for Summary Judgment is hereby GRANTED, and that the Defendants' Motion for Summary Judgment is hereby DENIED.

IT IS FURTHER ORDERED DECREED that the 1954 Act did not terminate the Tribe's existence as a tribal government;

The pre–1954 relationship between the federal government and the Tribe was based upon a political classification rather than an impermissible classification based upon race or national origin;

The State of Texas fully and completely assumed the duties and responsibilities previously exercised by the United States upon enactment of the 1954 Act, thus the relationship between the Tribe and the State is based upon that same political classification that formed the basis of the Federal trust relationship;

The Texas Constitution does not extinguish the duties assumed by the State in 1954 or the pre-existing relationship between the State and the Tribe;

The trust assumed by the State in 1954 is not dry; and

The Texas Indian Commission violated the 1954 Act when it refused to accept the Tribe's offer of title in trust to the "State tract."