The ONEIDA INDIAN NATION OF NEW YORK, the Oneida Indian Nation of Wisconsin, Oneida of the Thames Band, et al., Plaintiffs–Appellants,

The Houdenosaunee, the Oneida Nation, the Onondaga Nation, the Mohawk Nation, the Seneca Nation, and the Tuscarora Nation, Plaintiffs–Intervenors–Appellants,

v.

STATE OF NEW YORK and Various State Agencies; Twelve New York Counties, Valentine Ryan, Individually and as Class Representative; St. Regis Paper Company, Individually and as Class Representative; Georgia Pacific Corporation, Individually and as Class Representative; and New York State Electric and Gas Corporation, Defendants–Appellees.

Nos. 1145, 1144 and 1146, Dockets 86–9052, 86–9072 and 86–9074.

United States Court of Appeals, Second Circuit.

Argued June 2, 1987.

Decided Oct. 31, 1988.

Arlinda Locklear, Washington, D.C. (Richard Dauphinais, Native American Rights Fund, Washington, D.C., Francis Skenadore, Oneida Tribal Law Office, Oneida, Wis., Norman Dorsen, N.Y.U. Law School, New York City, on the brief, for plaintiff-appellant Oneida Indian Nation of Wisconsin, Daan Braveman, Gary Kelder, Syracuse Univ. Law School, Syracuse, N.Y., on the brief, for plaintiff-appellant Oneida of the Thames Band, Bertram Hirsch, Floral Park, N.Y., on the brief, for plaintiff-appellant Oneida Indian Nation of New York), for plaintiffs-appellants.

Curtis G. Berkey, Washington, D.C. (Robert T. Coulter, Indian Law Resource Center, Washington, D.C., on the brief), for plaintiffs-intervenors-appellants Houdenosaunee & constituent nations.

Allan Van Gestel, Boston, Mass. (Jeffrey C. Bates, Goodwin, Procter & Hoar, Boston, Mass., on the brief, for defendants-appellees twelve New York Counties & Ryan,

Richard K. Hughes, Hiscock & Barclay, Syracuse, N.Y., on the brief, for defendants-appellees St. Regis Paper Co. & Georgia Pacific Corp., Robert Abrams, Atty. Gen., Peter H. Schiff, Albany, N.Y., on the brief, for defendants-appellees State of N.Y. & various State Agencies; Howard M. Schmertz, Huber, Lawrence & Abell, New York City, on the brief, for defendant-appellee New York State Elec. & Gas Corp.), for defendants-appellees.

Before NEWMAN, KEARSE and WINTER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal requires consideration of the validity of two treaties under which New York purchased more than five million acres of land from the Oneida Indians in 1785 and 1788. The appeal is unusual because it requires a federal court, perhaps for the first time, to determine whether actions of a state violated the Articles of Confederation. These matters arise on an appeal by the Oneidas and other Indians from a judgment of the District Court for the Northern District of New York (Neal P. McCurn, Judge) dismissing their suit against the State of New York and others for recovery of the land and damages. The District Court dismissed the suit for failure to state a claim on which relief can be granted, after conducting an extensive hearing into the historical background of the relevant documents, as required by this Court's prior decision, *Oneida Indian Nation of New York v. State of New York*, 691 F.2d 1070 (2d Cir.1982) (*Oneida I*). We agree with Judge McCurn that the treaties under which the land was acquired were not invalid under the Articles of Confederation, the Proclamation of 1783, or the 1784 Treaty of Fort Stanwix. We therefore affirm the judgment of the District Court.

### Background

This litigation began in 1978. Suit was filed by the Oneida Indian Nation of New York and some of its members. 78 CV–104 (N.D.N.Y.). Defendants were the State of New York and several state agencies and state officials. A similar suit was filed in 1979 by the Oneida Indian Nation of Wisconsin and the Oneida of the Thames Band, a Canadian tribe located in Ontario. 79–CV–798 (N.D.N.Y.). The second suit named as defendants the State of New York, several state agencies and officials, and several counties, municipalities, and businesses located in the area that is the subject of the litigation. In 79–CV–798, a defendant class was certified consisting of approximately 60,000 individuals, businesses, and governmental entities and officials. Because of a tribal dispute over recognition of a governing body of the Oneidas of New York, the first suit remained somewhat inactive, and the litigation continued in the second suit, although both suits are the subject of the dispositive rulings now pending on appeal. Intervention in the second suit was subsequently granted to the Houdenosaunee, a confederacy of the six Iroquois Nations, and five of its constituent nations, the Oneida, Onondaga, Mohawk, Seneca, and Tuscarora Nations. *See Oneida Indian Nation of Wisconsin v. State of New York*, 732 F.2d 259 (2d Cir.1984). The sixth nation in the confederacy is the Cayuga Nation.

The subject of the litigation is a swath of land in central New York 50 to 60 miles wide, extending from New York's southern border with Pennsylvania to its northern border with Canada. The land comprises more than five and one-half million acres and encompasses portions of thirteen New York counties. New York acquired the land as a result of two treaties it concluded with the Oneidas—the Treaty of Fort Herkimer, signed on June 23, 1785, and the Treaty of Fort Schuyler, signed on September 22, 1788. By the first treaty New York acquired 300,000 acres for $11,500 in goods and cash. By the second treaty New York acquired approximately five million acres for $5,500 in goods and cash, plus a payment of $600 per year. The annual payment obligation was capitalized and discharged by a lump-sum payment in 1839. N.Y. Laws ch. 518 (1839).

The plaintiffs challenged the validity of the two transactions on a number of

grounds, of which only three have survived the prior appeal to concern us on the pending appeal: lack of consent by the Confederal Congress, alleged to be required by the Articles of Confederation, conflict with the 1784 Treaty of Fort Stanwix between the United States and the Six Nations, and conflict with the Proclamation of 1783, issued by the Confederal Congress. The District Court originally dismissed all of the claims for legal insufficiency in 1981. *Oneida Indian Nation of New York v. State of New York,* 520 F.Supp. 1278 (N.D. N.Y.1981).

On the first appeal we upheld much of what the District Court had decided. *Oneida I.* We upheld the rejection of New York's defenses of Eleventh Amendment immunity, *id.,* 691 F.2d at 1079–80, non-justiciability, *id.* at 1080–83, and untimeliness, *id.* at 1083–84. With respect to justiciability, we upheld the power of a federal court to determine in general Indian land rights based on Indian treaty or other federal law but did not focus specifically on issues of justiciability that might arise in the course of considering the merits of the particular claims advanced by the plaintiffs. With respect to timeliness, we rejected the applicability of state statutes of limitations to the plaintiffs' federal law claims and also ruled that a time bar based on federal law was not applicable since the tribes should not be precluded in circumstances where the United States would be entitled to sue; the United States could sue for damages until December 31, 1982, on claims that accrued prior to July 18, 1966, *see* 28 U.S.C. § 2415(a), (b) (1982 & Supp. IV 1986), and could sue without any time limit to establish title or possession, *id.* § 2415(c). Though our prior opinion contained no discussion of a defense of laches, it stated in its conclusion that this defense was being rejected. *Oneida I,* 691 F.2d at 1097.[1]

Turning to the merits of the plaintiffs' claims, the panel in *Oneida I* upheld the District Court's rejection of the claim that the lands had been acquired by fraud, *id.* at 1096, and the claim that the 1788 transaction was a lease, creating a right of reversion that could not lawfully be acquired without congressional consent after enactment of the first Nonintercourse Act, Act of July 22, 1790, 1 Stat. 137 (1845) (current version codified at 25 U.S.C. § 177 (1982). With these matters cleared away, the panel then focused on the issues at the heart of the current controversy. Ultimately the panel concluded that the claims based on the Articles of Confederation, the Treaty of Fort Stanwix, and the Proclamation of 1783 could not be resolved on a motion to dismiss under Fed.R.Civ.P. 12(b)(6) "without affording the plaintiffs an evidentiary hearing in order to clarify the meaning and context of [contemporaneous] statements relied on and the weight to be given to them." *Oneida I,* 691 F.2d at 1086. The case was remanded for such a hearing.

On remand, the District Court assembled a voluminous record, detailed examination of which has occasioned the delay in issuing this opinion. In live testimony, videotaped depositions, and written statements, several of the nation's foremost historians of the confederal period gave their views about the background and meaning of the key documents at issue in the litigation. Their statements were accompanied by hundreds of supporting documents, including the correspondence of the principal participants. In a scholarly and comprehensive opinion, Judge McCurn adhered to his previous decision, dismissing as legally insufficient all of the plaintiffs' remaining claims. *Oneida Indian Nation v. State of New York,* 649 F.Supp. 420 (N.D.N.Y.1986). We will set forth Judge McCurn's rulings with respect to each of the principal points

---

1. The writer accepts the prior panel's rejection of a laches defense as the law of the case, though would find the issue to be a substantial one if it were open. In *County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985), four Justices of the Supreme Court expressed the view in dissent that suits such as the pending one are barred by laches. *Id.* at 255, 105 S.Ct. at 1262 (Stevens, J., with whom Burger, C.J., and White and Rehnquist, JJ., concur, dissenting). The majority did not reach the laches defense on the ground that the issue had not been preserved in the Court of Appeals. *Id.* at 245, 105 S.Ct. at 1257. The majority observed in a footnote that application of the defense of laches to an action at law would be "novel." *Id.* at 244 n. 16, 105 S.Ct. at 1257 n. 16.

at issue in the course of our consideration of the merits.

## Discussion

### I. The Rights Concerning Indian Lands

■ Under the so-called Doctrine of Discovery, long recognized by the Supreme Court, *Worcester v. Georgia,* 6 Pet. (31 U.S.) 515, 543, 8 L.Ed. 483 (1832); *Johnson v. McIntosh,* 8 Wheat. (21 U.S.) 543, 573–74, 5 L.Ed. 681 (1823), the discovering nations held fee title to Indian land, subject to the Indians' right of occupancy and use. *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985); *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974). This distinction between fee title and the Indians' right of occupancy and use, sometimes called Indian title or aboriginal title, gave rise to a corresponding distinction between the rights to affect fee title and Indian title. The right to extinguish Indian title, sometimes called a right of extinguishment, was held by the sovereign—Great Britain in the period prior to the American Revolution. Whether this right was held by the United States or by the individual states during the confederal period is part of the pending controversy. Since the adoption of the Constitution, there has been broad agreement that the right of extinguishment belongs to the national government. *See Oneida Indian Nation v. County of Oneida, supra,* 414 U.S. at 667, 94 S.Ct. at 777. The right to purchase the fee title to Indian land is known as the right of preemption. Whether the right of preemption enjoyed by the states during the confederal period includ-

ed the right of extinguishment is also part of the pending controversy.

### II. The Claim Under the Articles of Confederation

Plaintiffs contend that under the Articles of Confederation the United States held the exclusive right of extinguishment of Indian title as to all Indian lands, both within and beyond the borders of the states. As a consequence, the argument continues, New York's acquisition of the disputed lands is invalid for lack of consent by the Confederal Congress. At a minimum, plaintiffs contend, Congress had the power to control the right of extinguishment in the exercise of its power to make peace treaties with the Indians and that, without consent of the Confederal Congress, no state could extinguish Indian title under circumstances that would interfere with congressional power to treat with the Indians on matters of war and peace.

Before examining these contentions, we pause to notice the jurisdictional conundrum posed for an Article III court by a claim alleging a violation of the Articles of Confederation. During the Confederation, there were no national courts authorized to adjudicate any issues arising generally under national law.[2] Though the Constitution established as the supreme law of the land all treaties previously made, U.S. Const. art. VI, cl. 2, it did not expressly incorporate, even for purposes of adjudicating antecedent disputes, the Articles of Confederation or statutes enacted by the Confederal Congress. With no national court available to adjudicate an Articles claim during the Confederation and no express incorporation of the preexisting Articles as binding law after the Confederation, how

---

2. The only permanent national court existing under the Confederation was the Court of Appeals in Cases of Capture, created by Congress in 1780 to hear appeals of prize cases from state courts exercising admiralty jurisdiction. *See* 17 Journals of the Continental Congress 458–59 (May 24, 1780); *Hart and Wechsler's The Federal Courts and the Federal System* 5 n. 18 (Bator et al. eds. 1973). This Court was created by the Confederal Congress under its Article IX(1) power to establish courts "for receiving and determining finally appeals in all cases of cap-

tures." *See Martin v. Hunter's Lessee,* 1 Wheat. (14 U.S.) 304, 345, 4 L.Ed. 97 (1816). In addition, the Confederal Congress on one occasion used its Article IX(2) power to create a panel to adjudicate a land dispute between Connecticut and Pennsylvania concerning the territory along the Susquehanna River known as the Wyoming Valley. *See* 1 J. Goebel, Jr., *History of the Supreme Court of the United States: Antecedents and Beginnings to 1801,* at 188–93 (1971); *Hart & Wechsler, supra,* at 4 n. 17.

does an Article III court acquire jurisdiction over a claim arising under the Articles? The District Court, in its first decision in this litigation, had recognized the argument that federal jurisdiction was lacking for the claim under the Articles. 520 F.Supp. at 1291. The District Court ruled, however, that subject matter jurisdiction was plainly available for the claim arising under the Treaty of Fort Stanwix, incorporated as the supreme law of the land by the Constitution, *id.* n. 12, and concluded that the claim under the Articles was a pendent state law claim over which it elected to exercise jurisdiction under *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). 520 F.Supp. at 1291. Judge McCurn noted that New York had incorporated the Articles into its statutes in 1778. *Id.* at 1291 n. 13.

One may wonder whether New York's incorporation of the Articles was only an act of adherence to the Confederation or in addition was intended to render them part of the positive law of the State, enforceable in its courts. Even if New York courts viewed the Articles as enforceable "state" law, one may wonder whether they would have ever upheld a claim alleging that the State of New York had violated the Articles by acting in conflict with unexercised power of Congress.[3] One may even speculate that state judges in the confederal period might have left such power struggles between the states and Congress to adjustment through the non-judicial processes of government and through politics, perhaps inaugurating the political question doctrine.[4]

However we might resolve these doubts, we believe that the opinion of the prior panel in *Oneida I* established as the law of the case that jurisdiction exists for the claim based on the Articles and that this claim is justiciable, notwithstanding the fact that the dispute concerns the relative powers of Congress and a state under a governmental system that lacked a national judicial branch. On the prior appeal, we noted that the District Court had upheld subject matter jurisdiction, *Oneida I,* 691 F.2d at 1074. Since a reviewing court always has an obligation to satisfy itself of the existence of such jurisdiction, this may be deemed implicit approval of the District Court's jurisdictional ruling. As to justiciability, though the panel discussed only the general question of whether Indian land claims were justiciable, without explicit consideration of the justiciability of a claim based on the Articles, *id.* at 1080–83, the entirety of the panel's discussion of the merits was premised on the appropriateness of adjudicating that claim in the District Court. That was a principal reason for the remand. We therefore accept as the law of the case both subject matter jurisdiction over the Articles claim and its general justiciability, though, as we discuss below, one issue pertinent to that claim is not justiciable.

Apart from law of the case, we note that the Supreme Court has adjudicated a claim concerning title to Indian land even though the challenged acquisitions occurred during

---

**3.** *Cf. Irvine v. Sims's Lessee,* 3 Dall. (3 U.S.) 425, 464, 1 L.Ed. 665 (1799) (Iredell, J., concurring) (doubting whether prior to the Constitution court could consider claim that state statute violated compact between two states).

**4.** On at least one occasion during the Confederation a New York court decided a case in which it was claimed (by no less an advocate than Alexander Hamilton) that a New York statute was invalid because of a conflict with the Articles of Confederation. *Rutgers v. Waddington* (unreported) (Mayor's Court of New York City 1784), *summarized in* 1 J. Goebel, *supra,* at 132–34. The court was urged to conclude that the state statute, authorizing a trespass action for military occupation of private homes, was contrary to alleged releases effected by the Trea-

ty of Paris, ending the war with Great Britain, and thereby interfered with Congress's authority under the Articles. The court appeared to accept the proposition that no state could alter the Confederation or a treaty of the United States, but ultimately decided the case by narrowly construing the state statute, in light of the law of nations, to deny any benefit to the claimant. *See* 1 J. Goebel, *supra,* 131–37.

In *Phelps v. Holker,* 1 Dall. (1 U.S.) 261, 1 L.Ed. 128 (Pa.Sup.Ct.1788), the Pennsylvania Supreme Court construed the Articles as not including a full faith and credit obligation that would entitle a Massachusetts judgment to be conclusive evidence of a debt, enforceable in an *in rem* action in Pennsylvania. *Id.,* at 264 (Opinion of McKean, C.J.).

the interval between the Declaration of Independence and the Constitution. *Johnson v. McIntosh, supra.* The former Court of Claims also adjudicated an Indian claim arising from a land transaction occurring during the Confederation. *Six Nations v. United States,* 173 Ct.Cl. 899 (1965). Rejecting a claim under section 2(5) of the Indian Claims Commission Act, 25 U.S.C. § 70a(5) (1964) (repealed), the Court ruled that the Articles of Confederation did not establish a fiduciary relationship between the United States and the Six Nations with respect to lands within state borders. In *Penhallow v. Doane's Adm'rs,* 3 Dall. (3 U.S.) 54, 1 L.Ed. 507 (1795), the Supreme Court, in upholding the validity of a judgment entered during the confederal period by the Court of Appeals in Cases of Capture, adjudicated the validity of congressional action taken under the Articles and even action taken prior to their ratification.

### A. The Context, Structure, and Text of the Articles of Confederation

We turn then to the merits of appellants' claim under the Articles, initially bearing in mind the relevant historical context.

The framing and ratification of the Articles of Confederation occurred against a background dominated by two overriding circumstances pertinent to the issues in this litigation. First, treaties of peace with both Great Britain and with the Six Nations of the Iroquois Confederacy had not yet been concluded. The Articles were submitted to the states in 1777 and ratified by Maryland, the last state to do so, in 1781. The Treaty of Paris, formally ending hostilities with Great Britain, was not signed until September 3, 1783, 8 Stat. 80 (1848), and the Treaty of Fort Stanwix, ending hostilities with the four Iroquois nations that had sided with the British—the Senecas, Mohawks, Onondagas, and Cayugas—and assuring protection to the two Iroquois nations that had sided with the United States—the Oneidas and the Tuscaroras—was not signed until October 22, 1784. Second, there existed a major controversy between the so-called landed states—those claiming Western lands—and the so-called landless states—those without

such claims. The landed states, New York, Connecticut, Massachusetts, Virginia, North Carolina, South Carolina, and Georgia, asserted their claims primarily on the basis of their colonial charters, except for New York, which based its claim on its one hundred year history of special relationship with the Six Nations. The landless states were New Hampshire, Rhode Island, New Jersey, Pennsylvania, Delaware, and Maryland. A dominant concern of the new national government was to limit the territory of the landed states to their traditional borders near the East Coast and secure for the United States the vast domain of land these states claimed westward to the Mississippi River, or even "to the South Sea," as stated in the colonial charters of Connecticut, Massachusetts, Virginia, North Carolina, South Carolina, and Georgia. Ultimately the new government was successful, as the landed states ceded "their" Western lands to the United States, often in exchange for recognition of favorable boundaries for their traditional areas of state jurisdiction.

It is in the context of these great issues of war and land that the fledgling national government undertook to determine the allocation of authority between the nation and the states on diverse matters, of which none was more contentious than Indian affairs. The close relationship between the evolution of the Articles of Confederation and resolution of the Western lands issue is vividly illustrated by the instructions of Maryland to her delegates not to agree to the Articles until matters concerning the Western lands had been settled. *See* U.S. C.A. Art. of Confed., Historical Notes 15 (1987).

The fundamental structure of the Articles is one of limited delegation of powers to the national government with reservation to the states of all powers not delegated. Article II provides:

> Each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled.

The Necessary and Proper Clause, which played such a significant part in the shaping of federal powers under the Constitution, *see McCulloch v. Maryland,* 4 Wheat. (17 U.S.) 316, 4 L.Ed. 579 (1819), was absent from the Articles of Confederation.

Two clauses of Article IX set forth the delegated powers pertinent to the pending litigation. Article IX(1) provides:

The United States in Congress assembled, shall have the sole and exclusive right and power of determining on peace and war, except in the cases mentioned in the sixth article....

Article IX(4) provides:

The United States in Congress assembled shall also have the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated....

The extent to which the authority of Congress was limited by the phrase "not members of any of the States" and by the Legislative Rights Proviso are major issues of dispute in this litigation.

Two clauses limiting the authority of the states are relevant to the pending issues. Article VI(1) provides:

No State without the consent of the United States in Congress assembled, shall ... enter into any conference, agreement, alliance or treaty with any king, prince or foreign state....

Article VI(5) provides:

No State shall engage in any war without the consent of the United States in Congress assembled, unless such State be actually invaded by enemies, or shall have received certain advice of a resolution being formed by some nation of Indians to invade such State, and the danger is so imminent as not to admit of a delay, till the United States Congress assembled can be consulted....

B. The Source of National Power to Make Peace Treaties with the Indians

A fundamental issue that divides the parties is whether federal power to make peace treaties with the Indians derives from Article IX(1) or Article IX(4). The dispute is important because the plaintiffs, relying on clause 1, contend that the national power to make peace treaties with the Indians included the power to extinguish Indian title, whereas the defendants, relying on clause 4, contend that the national power to make treaties with the Indians in the course of "managing all affairs" with them was subject to the Legislative Rights Proviso in that clause, a proviso the defendants contend confirmed state authority to extinguish Indian title to lands within state borders. As a fallback position, the defendants also contend that, even if Indian peace treaty power derives from clause 1, that power is nonetheless modified by the Legislative Rights Proviso of clause 4.

The District Court resolved this dispute in favor of the plaintiffs but with a qualification that results, in effect, in a victory for the defendants. Judge McCurn first concluded that "the plain language of clause 1 indicates that congress had clause 1 authority over Indians." 649 F.Supp. at 434. He then stated that Congress' power to make treaties with the Indians was exclusive only with respect to treaties of war and peace, *id.* at 435; with respect to treaties to purchase land, he concluded that the states had such power under clause 4 by virtue of the Legislative Rights Proviso and that this Proviso included the right to purchase Indian land and extinguish Indian title without consent of the Confederal Congress, *id.* at 434.

■ Though we reach the same ultimate conclusion, we travel a different analytical route. We do not agree with Judge McCurn that clause 1 conveyed to the Confederal Congress exclusive power to make only certain kinds of treaties with the Indians. The plain language of clause 1 indicates to us that whatever power was there contained was indivisible. We see no basis for reading clause 1 to give Congress exclusive power to make some treaties with the Indians, leaving the states with power to make other treaties with them. As we read clause 1, it has no application to Indi-

ans. Instead, we read clause 4, with its grant of national power to manage "all affairs" with the Indians, to grant the Confederal Congress the power to make any treaties with the Indians—on war and peace and on other subjects such as land acquisitions. The clause 4 power, however, was subject to the Legislative Rights Proviso, and we read this Proviso to reflect the same distinction Judge McCurn read into clause 1. The Proviso was not a grant to the states of an indivisible array of powers. We conclude that it did not give the states any power to make treaties of war and peace with the Indians (such power belonging exclusively to Congress under clause 4), but that it did give the states the power to purchase Indian land within their borders and extinguish Indian title to such land so long as such activity did not interfere with Congress's paramount powers over war and peace with the Indians.

■ Our reasons for reaching these conclusions start with the text of the pertinent provisions. Clause 1 grouped Congress's exclusive power to make treaties with its exclusive power to send and receive ambassadors. The grant of such exclusive powers was complemented by the denial to the states in Article VI(1) of the power, without consent of Congress, to make any treaty or to exchange embassies with "any king, prince or state." In none of the contemporaneous materials were the Indian nations or their leaders referred to as a "king, prince or state." This phrase plainly applied to foreign nations. It was to these nations, not Indian "nations," that the United States sent ambassadors, and it was with these nations that the United States could make treaties under clause 1. The Supreme Court has referred to the Indian tribes as "domestic dependent nations" in concluding that they are not "foreign states" within the meaning of section 2 of Article II of the Constitution. *See Cherokee Nation v. Georgia,* 5 Pet. (30 U.S.) 1, 17, 8 L.Ed. 25 (1831).

A further consideration, based on both the text of the Articles and contemporanous practice, concerns ratification. Article IX(6) prohibited the United States from entering into "any treaties or alliances ... unless nine States assent to the same." During the confederal period, treaties between the United States and Indian nations were not submitted to the states for ratification. In particular, the Treaty of Fort Stanwix, which plaintiffs rely on in this litigation as an exercise of Congress' authority under Article IX(1), became effective when it was signed. Congress did not submit it for ratification but merely directed that the Treaty be published and transmitted to the states. 28 Journals of the Continental Congress 423–26, 430 (June 6, 1785) [hereinafter cited as "JCC"]. Treaties authorized by clause 1 of Article IX were those that required ratification as provided in clause 6. By not submitting Indian treaties for ratification, the negotiators and the Confederal Congress to which they reported indicated their contemporaneous understanding that such treaties were authorized by clause 4 as part of "managing all affairs with the Indians," rather than by clause 1.[5]

A further textual consideration arises from the fact that although Article IX(1) included treaties of "commerce," Article IX(4) expressly covered "trade" with the Indians, further indicating that the powers of Article IX(1) were those relating to foreign countries, not domestic Indian nations.

Plaintiffs contend that in one respect the text of the Articles supports their reading of Article IX(1). They rely on the provision of Article VI(5), which exempted the states from the prohibition against engaging in war without the consent of Congress when there is imminent danger of invasion by "some nation of Indians." Since an exception for threat of invasion by Indians was contained in the article generally restricting the states' powers concerning war and peace and since this exception was expressly referred to in Article IX(1), plaintiffs

---

**5.** Interestingly, one of the first proposals made by President Washington to the First Congress under the Constitution was that Indian treaties should henceforth be submitted to the Senate for ratification in the same manner as treaties with European nations. 1 *Messages and Papers of the Presidents* 61–62 (Sept. 17, 1789).

argue that matters concerning war and peace with the Indians must have fallen within Article IX(1)'s grant of exclusive authority to Congress over war and peace. Though the argument found favor with the District Court, 649 F.Supp. at 434–35, we are not persuaded. Article VI(5) simply recognized that threat of invasion by Indians justified an exception to what would otherwise have been exclusive power in Congress over matters of war and peace, but it sheds no light on whether such power, with respect to Indians, was conferred by clause 1 or clause 4 of Article IX. The reference to the exception in Article IX(1) lends some support to an inference that clause 1 was the source of authority for Indian treaties, but this arguable inference is insufficient to overcome the contrary textual considerations.

Contemporaneous understanding of the legislators who had framed the Articles of Confederation further supports our conclusion. On several occasions, committees of the Confederal Congress filing reports concerning their investigations of Indian affairs on matters of war and peace explicitly referred to Article IX(4) as the source of their authority and made no mention of Article IX(1). *See, e.g.*, 33 JCC 454, 458 (Aug. 3, 1787); 25 JCC 680–93 (Oct. 15, 1783). The report filed on October 15, 1783, by the committee investigating Indian affairs in the Southern Department explicitly referred to the authority of Congress to make peace treaties with the Indians and relied upon Article IX(4). Especially pertinent is the April 21, 1783, resolution of a committee of Congress reporting on steps to end hostilities with the Indians and to prepare for peace treaties. Reciting the source of congressional authority, the resolution relied on the Article IX(4) power of "managing all affairs with the Indians" and made no mention of Article IX(1). 24 JCC 264 (Apr. 21, 1783). In this regard it is also notable that the Proclamation of 1783, a broad exercise of national authority over Indian affairs, which we consider below, expressly referred to the language of Article IX(4) as the source of authority for the Proclamation, and made no mention of

Article IX(1). Proclamation of 1783, *reprinted in* 25 JCC 602 (Sept. 22, 1783).

█ We do not doubt that treaties made during the confederal period between the United States and Indian nations are entitled to the same respect as treaties made with foreign nations and that both equally became "the supreme Law of the Land" by virtue of Article VI of the Constitution. *See Worcester v. Georgia, supra,* 6 Pet. at 559. We conclude only that Congress's power to make Indian treaties derived from Article IX(4).

C. National and State Authority Under Article IX(4)

1. *Evolution of Article IX(4).* Examination of the evolution and contemporaneous understanding of clause 4 of Article IX confirms our conclusion that national authority to make treaties with the Indians derived from this clause and also sheds significant light on the respective powers of the national government and the states in Indian matters, particularly in regard to the purchase of Indian lands. The first draft of the Articles of Confederation, prepared by Benjamin Franklin in 1775, would have given Congress complete and exclusive authority over Indian affairs. Only Congress could purchase Indian land. 2 JCC 195–99 (July 21, 1775). Franklin's draft was not submitted to Congress.

The draft that served as the basis for amendment and ultimate adoption was prepared by John Dickinson. *See* 5 JCC 546–54 (July 12, 1776). The Dickinson draft submitted to Congress on July 12, 1776, gave Congress "the sole and exclusive Right and Power of ... Regulating the Trade, and managing all Affairs with the Indians." Dickinson Draft of Articles of Confederation art. XVIII, 5 JCC 550 (July 12, 1776). This draft also dealt specifically with state authority to purchase Indian lands. In a provision more narrow than Franklin's draft, Dickinson's draft provided that no person or colony could purchase Indian land until state boundaries were determined, and Congress was given power to set such boundaries. Once the boundaries were determined, only Congress could

purchase Indian land *outside* such boundaries. The plain implication was that after the boundaries were fixed, states could purchase Indian lands *inside* their boundaries. *Id.* art. XIV.

During the summer of 1776, a Committee of the Whole modified the Dickinson draft. The Committee's version, reported to Congress on August 20, 1776, deleted Article XIV from Dickinson's draft, eliminating even the prohibition on the authority of colonies to purchase Indian lands prior to ascertainment of state boundaries. The grant of exclusive power to Congress of "regulating the trade, and managing all affairs with the Indians," contained in renumbered Article XIV, was now modified to apply only to Indians "not members of any of the States." Committee Draft of Articles of Confederation art. XIV, 5 JCC 682 (Aug. 20, 1776).

Debate on the Articles languished until 1777 and did not resume on the clauses concerning Indian lands until October 1777. On October 27, two amendments were offered to the draft article granting Congress power over Indian affairs. The first, evidently offered by those interested in limiting national power, would have deleted the phrase "not members of any of the states" and substituted "not residing within the limits of any of the United States." 9 JCC 844 (Oct. 27, 1777). This amendment would have narrowed national power to Indians living outside the territorial limits of the states. The second amendment, evidently offered by those interested in broadening national power, would have rewritten the entire grant of power to Congress to read: "managing all affairs relative to war and peace with all Indians not members of any particular State, and regulating the trade with such nations and tribes as are not resident within such limits wherein a particular State claims, and actually exercises jurisdiction." *Id.*

Two aspects of this second amendment are significant. First, it showed that those endeavoring to broaden national power, the landless states, wanted national authority over trade with the Indians to apply even to Indians within a state's limits under circumstances where a state was not "actually exercis[ing] jurisdiction." Second, it showed that even those seeking to broaden national power assumed that the phrase "managing all affairs with the Indians" included the power to deal with matters of war and peace with the Indians. The proponents of this amendment, in seeking broader national authority over Indian trade than over Indian war and peace matters, left the latter topic in what became Article IX(4); they did not bother to suggest any modification of the provisions that became Article IX(1) because they understood that the issues of war, peace, and treaties that were dealt with in those provisions concerned only relations with foreign countries.

The following day, October 28, the Congress, without explanation but evidently in a spirit of compromise, rejected both of the pending amendments and decided instead to leave the wording of the grant of national power respecting Indian affairs unchanged but to add the words of the Legislative Rights Proviso: "provided, that the legislative right of any State within its own limits be not infringed or violated." *Id.* at 845.[6] Thus, the somewhat ambiguous "not members" phrase was retained without either expansion or contraction, but a broad protection of state authority was expressly inserted, a protection of authority within a state's "limits," not merely within 'areas over which it was "actually exercis[ing] jurisdiction."

In two respects the evolution of Article IX(4) is especially pertinent to the pending controversy. First, the process that began with Franklin's draft and ended with the Articles as adopted represents a gradual victory for the landed states, which were seeking to curtail national power over Indian affairs. It would be inconsistent with this pattern of diminishing national power to find in the Articles an implicit prohibition barring the states from purchasing Indian land within their borders without

---

**6.** The amendment contains a comma after the word "State," which was omitted in the Articles as finally adopted. The omission appears to have no significance.

the approval of Congress. Second, the contention that the exclusive Article IX(1) power of Congress to make treaties comprehends Indian treaties and thereby precludes state treaties to purchase Indian lands is refuted by the meticulous attention the Congress gave to Article IX(4). In the struggle between the states seeking to expand national power over Indian affairs and those seeking to narrow such power, all the attention was focused on the provisions that became Article IX(4). There was no controversy about the meaning of the national treaty power in Article IX(1). The entire debate over Article IX(4) would have to be ignored to conclude that while the landed states were winning their fight to refine Article IX(4) to their liking, there was always implicit in Article IX(1) a broad grant of exclusive national power that precluded by negative implication state purchases of Indian land within state borders.

Once it is understood that the allocation of power respecting all Indian affairs is governed solely by Article IX(4), there can be little doubt, as the preceding discussion has foreshadowed, that clause 4 confirmed the right of the states to purchase Indian lands within their borders without the consent of Congress, at least under circumstances that did not interfere with the war and peace powers of the Congress. Though the terms of clause 4 have properly been characterized as "ambiguous," *Worcester v. Georgia, supra,* 6 Pet. at 559 (1832), and even "obscure and contradictory," *The Federalist* No. 42, at 334 (J. Madison) (J. Cooke ed. 1961), the fundamental purpose and meaning of the Legislative Rights Proviso is clear in this respect.

In construing Article IX(4), we will assume without deciding that the District Court was correct in accepting appellants' contention that the "not members" phrase applied to Indians, such as those of the Six Nations, who were not assimilated into the body politic of any state, though located within its territorial limits. 649 F.Supp. at 431–32. Even if that is so, we agree with the District Court that the Legislative Rights Proviso confirmed the authority of the states to purchase Indian land within its borders without securing congressional consent. *Id.* at 433–35. Though the text of Article IX(4) does not settle the matter one way or the other, the contemporaneous materials examined by the District Court provide a firm basis for the Court's conclusion.

2. *Contemporaneous Understanding of Article IX(4).* Prominent among the contemporaneous materials surveyed by Judge McCurn is the correspondence between James Monroe and James Madison specifically discussing whether New York's claimed right to purchase Indian lands conflicted with the Articles of Confederation. In response to Monroe's query, Madison candidly recognized that Article IX(4) was ambiguous since the Legislative Rights Proviso, if "taken in its full latitude," would "destroy" the authority of Congress. Letter from James Madison to James Monroe (Nov. 27, 1784), *reprinted in* II *The Writings of James Madison* 91 (Hunt ed. 1901). Endorsing an interpretation that endeavored to harmonize the Proviso with the grant of national regulatory power, Madison concluded that the Proviso guaranteed the states the right to purchase Indian land.[7] Specifically referring to the relationship between New York's proposed purchase and the national government's Treaty of Fort Stanwix, he said that "as far as N.Y. may claim a right of treating with the Indians for the purchase of lands within her limits, she has the confederation on her

---

7. Madison set out four reasons for his conclusion:

    1. That this was the principal right formerly exerted by the Colonies with regard to the Indians. 2. that it was a right asserted by the laws as well as the proceedings of all of them, and therefore being most familiar, wd. be most likely to be in contemplation of the Parties; 3. that being of most consequence to

the States individually, and least inconsistent with the general powers of Congress, it was most likely to be made a ground of Compromise. 4. it has always been said that the proviso came from the Virga. Delegates, who wd naturally be most vigilant over the territorial rights of their Constituents.

II *The Writings of James Madison, supra,* at 91–92.

side." [8]  *Id.*

One somewhat equivocal indication of contemporaneous understanding is the resolution adopted by the Confederal Congress in 1783 in response to Pennsylvania's notification of its intention to make a treaty with the Indians for the purchase of land within the state's acknowledged borders. The Pennsylvania General Assembly had broached to Congress the topic of a land purchase in a carefully worded resolution that invited Congress to express its views but did not acknowledge the power of Congress to withhold consent. The resolution made clear Pennsylvania's view that "the Articles of Confederation do not by any means explicitly restrict [the Pennsylvania General Assembly] from entering on this business [of a purchase of Indian land] independent of Congress," yet sought the "sense of the Congress" concerning the purchase "being deeply impressed with the delicacy of touching any subject of federal relation, but with the most deliberate caution; and as the letter of a clause in the ninth section [Article IX(4)] appears to involve a doubt...." 25 JCC 594 (Sept. 20, 1783).

The committee of Congress considering the matter recommended advising Pennsylvania that Congress had no objection "provided no engagements relative to peace or war with the said Indians, be entered into by the said State, the power of holding treaties on this subject being vested by the Confederation solely in the United States in Congress assembled." *Id.* at 591. Though that view of national and state authority is consistent with our conclusions, the emphasis on national authority was evidently worded too strongly for the landed states, most of which joined together in defeating this version of the committee's resolution. After considerable attempts to find acceptable language, Congress ultimately adopted a far more innocuous resolution, stating only that the federal commissioners who were about to meet with the Indians to conclude a peace treaty should give notice to Pennsylvania of the time and place of holding the treaty "to the end, that the persons to be appointed by [Pennsylvania], for purchasing lands within the limits thereof, at the expence of the said State, may attend for the sole purpose of making such purchase, at the time and place appointed for holding the said treaty." 25 JCC 767 (Oct. 30, 1783). Then, in lieu of the original language that had endeavored to describe the exclusive area of national authority, the resolution added that the United States commissioners are instructed to give "every assistance in their power" to the Pennsylvania negotiators "towards promoting the interest of that State, as far as the same may consist with the general interest of the Union." *Id.*

Appellants draw from this episode the conclusion that Pennsylvania acknowledged the need to secure the approval of Congress for the land purchase. We think the episode lends greater support to the position of the appellees. Pennsylvania was careful to maintain its position that the Articles did not authorize Congress to bar the State's purchase. Significantly, Congress expressed no contrary view. Even the draft resolution emphasizing exclusive national power only over matters of war and peace was thought too strong and was rejected in favor of a more generally worded version that referred vaguely to the "general interest of the Union."

More probative and strongly supportive of the appellees' position are the circumstances of Congress's reaction to New York's plans to undertake what ultimately became the first of the two purchases challenged in this litigation. During the course of congressional debate on resolutions of instruction to the federal commissioners who would negotiate the Treaty of Fort Stanwix, a resolution was offered concerning a then pending New York plan to dis-

---

**8.** Madison continued with the observation that "as far as she [New York] may have exerted that right [to purchase Indian land] in contravention of the Gen. Treaty [of Fort Stanwix] ..., she has violated both duty and decorum." Madison expressed no view on whether New York's pro-

posed purchase would violate the Treaty. It appears from this and other correspondence that he had not become aware of the terms of the Treaty at the time he wrote to Monroe. We consider this issue in part III, *infra.*

tribute to its soldiers some of the land New York was endeavoring to appropriate from the Onondagas and the Cayugas, tribes that had sided with the British during the Revolution. The resolution would have instructed that if the planned distribution "may so far irritate the Indians, as to expose these United States to the dangers and calamities of an Indian War," the federal commissioners were to report the difficulties to the New York legislature and "in such case, it is earnestly recommended to the legislature of New York, to revise the laws by which such appropriations have been made...." 25 JCC 642 (Oct. 3, 1783). Even this mild proposal was too strongly worded for New York and other landed states, and it was defeated. But it is powerful evidence that even as to a land acquisition that might lead to war with the Indians, Congress believed it had only the power to *recommend* that a state desist, not the power to withhold a consent necessary for such acquisition.

Further indication of the absence of national power to disapprove state Indian land purchases under the Confederation are the pertinent views expressed concerning the changed circumstances under the Constitution. Among the most well-known statements is the December 29, 1790, reply of President Washington to Corn Planter, Chief of the Senecas, who had complained about state purchases of Indian lands. Washington pointed out that these purchases had occurred before the adoption of the Constitution and added, "But the Case is now entirely altered. The General Government only has the Power to treat with the Indian Nations, ... No State, nor Person, can purchase your Lands, unless at a general Treaty, held under the Authority of the United States." *Proceedings of the*

*Commissioners of Indian Affairs* 166 n. 1 (Hough ed. 1861).

Thomas Jefferson, writing an official opinion as Secretary of State, expressed a similar view on May 3, 1790:

There are but two means of acquiring the native title. First, war; for even war may, sometimes, give a just title. Second, contracts or treaty.

The States of America before their present union possessed completely, each within its own limits, the exclusive right to use these two means of acquiring the native title, and by their act of union, they have as completely ceded both to the general government.

3 *The Writings of Thomas Jefferson* 19 (Lipscomb et al. eds. 1904).[9]

In 1832, Chief Justice Marshall also recognized the significant change. In reviewing the evolution of national power over Indian affairs, he noted the uncertainties created by the Legislative Rights Proviso in Article IX(4) and then observed that the "correct exposition of this article is rendered unnecessary by the adoption of our existing constitution.... [The new government's powers over Indian affairs] are not limited by any restrictions on their free actions; the shackles imposed on this power, in the confederation, are discarded." *Worcester v. Georgia, supra,* 6 Pet. at 559.

■ In concluding as we do that during the confederal period the states had authority to purchase Indian land within their borders without the need of congressional consent, we accept an important proposition advanced by the appellees concerning the meaning of "preemption" during this period—namely, that this right of the states included the right to extinguish Indian title. After the Constitution, when the United States acquired plenary power over

**9.** Jefferson subsequently expressed a view that appears to contradict his 1790 opinion. In a letter to the Secretary of War on August 10, 1791, Jefferson wrote:

[N]either under the present constitution, nor the ancient confederation, had any State or person a right to treat with the Indians, without the consent of the General Government. 8 *The Writings of Thomas Jefferson, supra,* at 227. The apparent contradiction was plausibly

explained in testimony to the trial court by pointing out that the 1790 opinion was affirming the states' right to acquire Indian land by purchase, whereas the 1791 opinion was concerned with the attempt by Georgia to appropriate Indian land by cession. The very next words of Jefferson's 1791 opinion add:

that that consent has never been given to any treaty for the cession of lands in question.... *Id.*

Indian affairs without the "shackles" of the Legislative Rights Proviso of Article IX(4), it is clear that the national government held the right of extinguishment of Indian title to all lands then owned by the Indians. But during the confederation, we are satisfied, after examination of the extensive materials presented to the trial court, that the historians who testified that the right of preemption enjoyed by the states then included the right of extinguishment have the better of the argument.

When Madison wrote his significant letter to Monroe on November 27, 1784, and set forth his reasons for construing the Legislative Rights Proviso to accord New York the right to purchase Indian land, he summarized the purport of the Proviso by saying that "it was to save to the States their right of preemption of lands from the Indians." II *The Writings of James Madison, supra,* at 91. It would have made no sense to argue so carefully the case in support of New York's right to make the purchase if Madison had meant that New York could acquire only fee title, leaving the Indians with Indian title that only the United States could extinguish. Significantly, one of the reasons Madison advanced for his interpretation favoring New York was that the right of preemption had previously been asserted by New York and many other states. Clearly, these states had been asserting a right to obtain complete title to Indian lands within their borders, not a partial right that left them subject to the assent of the national government.

Jefferson's opinion of May 3, 1790, written when he was Secretary of State, also recognized that the rights of a state were broader before the Constitution. Advising with respect to Georgia's attempt to convey land obtained from Indians, he said:

> Georgia, *possessing the exclusive right to acquire the native title,* but having relinquished the means of doing it to the national government, can only have put her grantee into her own condition. She could convey to them the exclusive right to acquire; but she could not convey

what she had not herself, that is, the means of acquiring.

3 *The Writings of Thomas Jefferson, supra,* at 20 (emphasis in original).

Marshall recognized the same point in *Johnson v. McIntosh, supra.* In recounting the development of the rights of discovering nations with respect to Indian lands, he observed:

> It has never been doubted, that either the United States, or the several states, had a clear title to all the lands within the boundary lines described in the treaty [ending the war with Great Britain], subject only to the Indian right of occupancy, and that the exclusive power to extinguish that right was vested *in that government which might constitutionally exercise it.*

8 Wheat. at 584–85 (emphasis added). It should be noted that Marshall was careful not to claim for the United States alone a right to extinguish Indian title, no doubt recognizing that the United States held such right as to Western lands but that the states held such right as to lands within their acknowledged borders. Marshall then considered the nature of Virginia's rights with respect to the particular parcels at issue in *Johnson,* land within the borders of Virginia that had been purchased by a private citizen from Indians in 1773 and 1775. After quoting Virginia's assertion in legislation passed in 1779 of the State's " 'exclusive right of preemption from the Indians, of all the lands within the limits of her own chartered territory,' " the Chief Justice concluded, "[I]t may safely be considered as an unequivocal affirmance, on the part of Virginia, of the broad principle which had always been maintained, that the exclusive right to purchase from the Indians resided in the government." *Id.* Having previously recognized that the right to extinguish Indian title was in "that government which might constitutionally exercise it," Marshall (and Virginia) were necessarily using "preemption" to include the right of extinguishment.

■ We conclude that the Article IX(4) power of Congress to manage Indian Affairs, as limited by the Legislative Rights

Proviso, did not preclude New York from making the 1785 and 1788 purchases of Oneida land within its borders.

### D. Inherent Right of External Sovereignty

If exclusive national power to extinguish Indian title during the Confederation with respect to lands within state borders was not supportable by Article IX(1) or Article IX(4), appellants contend that such power arose from the United States' inherent right of external sovereignty. This argument relies on the analysis of external sovereignty set forth by the Supreme Court in *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

*Curtiss–Wright* involved a challenge to the validity of a presidential proclamation barring the sale of arms to Bolivia, a nation then engaged in war in the Chaco. The proclamation was challenged on the ground that the joint resolution of Congress under which it issued was an unconstitutionally broad delegation of power. The Court rejected the challenge, concluding that the delegation objection was not valid with respect to the President's conduct of the foreign relations of the United States. In reaching this conclusion, the Court articulated the principle of external sovereignty. The Court reasoned that "international powers," *id.* at 316, 57 S.Ct. at 219, were never possessed by the colonies and therefore could not have been transferred by the newly established states to the national government when the nation was created. Such powers, being an attribute of sovereignty under the law of nations, were deemed to pass directly to the United States at the instant of independence from Great Britain. *Id.* Though the Court's opinion is concerned with national and especially presidential power under the Constitution, it is clear that Justice Sutherland believed that the scope of "international powers" was equally extensive during the

period between the Declaration of Independence and the Constitution:

> As a result of the separation from Great Britain by the colonies acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America.

*Id.* Some of the historians who testified in the trial court in this litigation advanced strong arguments for doubting the correctness of this proposition, but we are obliged to take our instruction as the Supreme Court gives it.[10]

Accepting the principle that the national government possessed inherent powers of external sovereignty during the confederal period, we nevertheless reject appellants' claim that the existence of such powers precluded the states from acquiring Indian title to land within their borders without the consent of Congress. First, we do not agree with the premise of appellants' argument that the powers of external sovereignty included authority over all purchases of Indian land. Indeed, we have considerable doubt whether the "international powers" discussed in *Curtiss–Wright* included any authority with respect to Indians. The whole tenor of the Court's discussion concerns international relations, the very matters that during the Confederation were the subject of the powers enumerated in Article IX(1), which did not include Indian affairs. We recognize, however, that Indian affairs do not fall neatly into the category of either international or domestic matters, and it is surely arguable that on matters concerning war and peace with the Indians, the national government did possess the inherent powers that *Curtiss–Wright* ascribed to the national government in the realm of traditionally "international" matters. But even if this is so, it is far too extravagant an extension of the concept of external sovereignty to maintain that it includes authority over *all* purchases of Indian land. To whatever

10. Even if the powers of external sovereignty flowed directly to the national government at the moment of independence, there is considerable basis for believing that the national govern-ment itself redistributed some of these powers to the states in establishing the scheme of government prevailing under the Articles of Confederation.

extent external sovereignty entitled the Confederal Congress to treat with the Indians on matters of war and peace, it did not vest the United States with a right of extinguishment with respect to land acquisitions by the states that did not implicate those matters.

Appellants appear to suggest, however, that New York's 1785 and 1788 purchases of Oneida lands did implicate issues of war and peace by posing a threat to the peace with the Six Nations that resulted from the Treaty of Fort Stanwix. This suggestion raises a question of justiciability that was not considered in *Oneida I*—whether a federal court may invalidate a state purchase of Indian land on the ground that the purchase posed a threat to peace with the Indians. This issue arises with respect to both appellants' claim based on external sovereignty and their claim, considered below, based on the Treaty of Fort Stanwix.

■■■ Even under the Constitution, with federal courts authorized by statute to decide questions arising under federal law, including treaties, it is clear that many questions concerning peace and war are not appropriate for determination by the Judicial Branch. The Supreme Court declared more than a century ago, for example, that the determination of the end of hostilities requires reference "to some public act of the political departments of the government to fix the dates." *The Protector*, 12 Wall. (79 U.S.) 700, 702, 20 L.Ed. 463 (1871). Previously the Court disclaimed authority to adjudicate the correctness of a decision of the President determining the existence of sufficiently "imminent danger of invasion" to warrant calling forth state militias. *Martin v. Mott*, 12 Wheat. (25 U.S.) 19, 6 L.Ed. 537 (1827). It may well be, as the Court has also indicated, that some issues concerning the existence of hostilities may not require deference to the decisions of the political branches, *see Baker v. Carr*, 369 U.S. 186, 211–12, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1962); *Woods v. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948). But it would be an extraordinary assertion of judicial authority under the Constitution for a federal court to determine whether action of a state posed a sufficient threat to peace to warrant invalidation because of conflict with inherent national power arising from external sovereignty. We think it likely that a federal court would disclaim such authority unless acting at the request of the United States in a lawsuit authorized by statute. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed 1153 (1952). If under the Constitution an Article III court could probably not, in the absence of a statute, deem justiciable the issue of whether a state land purchase imperiled the peace, it surely cannot do so when the challenge to the purchase arises under the Articles of Confederation. Thus, to the extent that the appellants' external sovereignty argument would require us to determine whether New York's land purchases in 1785 and 1788 posed a threat to peace with the Indians, we conclude that this issue is not justiciable.

Our second reason for rejecting the external sovereignty argument proceeds from the explicit recognition in *Curtiss–Wright* that the inherent power there recognized "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." 299 U.S. at 320, 57 S.Ct. at 221. That limiting principle must have been equally applicable to whatever inherent powers the national government possessed under the Confederation. If anything, it had more force prior to the establishment of the "more perfect Union." As we have earlier concluded, the organic law of the Confederation included in Article IX(4) a reservation of right to the States that enabled them to purchase Indian land within their borders and thereby to extinguish Indian title. Even an expansive reading of *Curtiss–Wright* does not support inherent national authority that may override this limitation.

III. The Claim Under the Treaty of Fort Stanwix

Appellants contend that the Treaty of Fort Stanwix prohibited New York's purchases of Oneida land without the consent of the Confederal Congress. Before turning to the specifics of this contention, we

note that it encounters the general objection, set forth above, that the national government lacked the power to impose such a limitation on New York's right to purchase Indian land within its borders. We acknowledge, however, that there is a plausible basis for recognizing power in the Confederal Congress to prohibit those state purchases that would imperil peace with the Indians, and to some extent appellants contend that the challenged New York purchases posed at least a threat to the peace secured by the Treaty of Fort Stanwix. Even this aspect of the claim encounters a serious objection. To whatever extent Congress's power on matters of war and peace with the Indians included authority to bar state purchases that imperiled peace with the Indians, we have the same concern about adjudicating challenges to the exercise of that power in a treaty as we previously expressed with respect to challenges to the exercise of inherent power arising from external sovereignty: At least in the absence of a statute authorizing federal court adjudication, it would have been up to Congress, not the judiciary, to determine that a particular state purchase posed a sufficient threat to peace to warrant invalidation. It is arguable, however, and perhaps this is appellants' point, that in authorizing and approving the Treaty of Fort Stanwix, Congress itself was making the determination that state purchases of Oneida lands would imperil peace with the Indians and for that reason would be prohibited in the absence of the consent of Congress. We will assume that Congress had the power to make such a determination and to implement it with such a prohibition, thereby removing from judicial scrutiny the issue of whether state purchases would imperil the peace. Nevertheless, we agree with the District Court that the treaty does not contain the prohibition for which the appellants contend.[11]

█ The textual basis for appellants' claim is Article II, which provides in its entirety:

> The Oneida and Tuscarora Nations shall be secured in the possession of the lands on which they are settled.

Treaty with the Six Nations, Oct. 22, 1784, 7 Stat. 15 (1846) (Treaty at Fort Stanwix). Manifestly this provision does not say in terms that the Oneidas may not sell their lands to New York without the consent of Congress. Despite the absence of any explicit language to that effect, the appellants' contend that the Treaty should be construed to contain such a limitation. They rely on cases holding that Indian treaties are to be broadly construed in favor of the Indians. *See, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 676, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979); *Antoine v. Washington,* 420 U.S. 194, 199–200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975). We will construe the Treaty with this principle in mind, examining the context in which the provision at issue appears and what can be gleaned concerning its contemporaneous understanding at the time of the negotiations.

█ Before turning to that task, we note three considerations that weigh heavily against the interpretation urged by the appellants. First, to read into the Treaty a general prohibition against land sales to states without approval of Congress would endow the Confederal Congress with authority to override the Legislative Rights Proviso of Article IX(4) by treaty. Under the Constitution, the treaty power cannot override constitutional limitations respecting individual rights, *Reid v. Covert,* 354 U.S. 1, 16–17, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957) (plurality opinion), though the relation of this power to state prerogatives is less certain, *see Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). It is highly doubtful that under the Articles of Confederation the reconciliation of national power and state prerogatives was subject to adjustment in favor of national power simply by the use of national treaties. Second, the rule of generous construction has not been applied to divest a

---

**11.** In view of this conclusion, we do not reach the argument, on which appellants' Treaty claim is premised, that the Treaty represents a determination by Congress that purchases of Oneida land would imperil the peace.

state of land it has acquired. On the contrary, the Supreme Court has cautioned that such a construction is not warranted "unless the purpose so to do be shown in the treaty with such certainty as to put it beyond reasonable question." *United States v. Minnesota,* 270 U.S. 181, 209, 46 S.Ct. 298, 306, 70 L.Ed. 539 (1926). Third, though the construction urged by the Oneidas would now inure to their benefit, it surely would not have been to their benefit at the time of the Treaty if their right to be secured in the possession of their lands carried with it a perpetual limitation on their right to sell portions of their lands.

The placement of Article II within the Treaty of Fort Stanwix is instructive. This article is one of four operative provisions of the Treaty, all of which are placed after the following introductory language:

> The United States of America give peace to the Senecas, Mohawks, Onondagas and Cayugas, and receive them into their protection upon the following conditions:
> ....

Treaty of Fort Stanwix, *supra,* 7 Stat. at 15. Thus, the context of Article II suggests that the guarantee to the Oneidas to be secured in the possession of their lands protected them against interference by the four hostile Iroquois Nations that had sided with the British, and had nothing to do with limiting lands sales to New York. This understanding of Article II is borne out by the statement of the federal commissioners at the concluding session of the negotiations on October 23, 1784. Speaking first to the four hostile nations, they said, "We have buried the hatchet, not only between the United States and you, but also *between our friendly Indians the Oneidas,* Tuscaroras, Mohickans and Cognewaghas *and yourselves.*" Minutes of the proceedings at Fort Stanwix in 1784, Wayne Manuscripts, Indian Treaties 1778 to 1795, B (Historical Society of Pennsylvania) [hereinafter "Wayne MSS"] (emphasis added). Then, speaking directly to the Oneidas and the Tuscaroras, the federal commissioners continued:

> Congress has not forgot your fidelity and attachment. They would not have made war with the hostile tribes, without se-

curing your interest but such a peace is now concluded *with them* as is perfectly agreeable *to you.* Now you may embrace the last hostile tribes as your brothers who have come home to you again after a long and anxious absence.

*Id.* (emphasis added).

The evolution of the Treaty, from its origins to the authorization for its publication, supports the appellees' view of its meaning. As Commander–in–Chief, George Washington set forth his views as to the nature and purposes of a treaty with the Six Nations in his September 7, 1783, letter to James Duane, the chairman of the committee of Congress appointed to confer with him. Washington urged that a treaty should be negotiated, establishing a boundary line for the lands of the Six Nations. He cautioned that private entrepreneurs should not be permitted to purchase Indian land, but recognized that land sales to government would occur: "[T]he Indians ... will ever retreat as our Settlements advance upon them and they will be as ready to sell, as we are to buy." 27 *The Writings of George Washington* 136 (Fitzpatrick ed. 1938). Then, focusing precisely on the issue that has come to dominate this litigation, he added:

> No purchase under any pretense whatever should be made by any other authority than that of the Sovereign power, *or the Legislature of the State in which such lands may happen to be.*

*Id.* at 137 (emphasis added).

The following month Congress adopted the report of its Committee for Indian Affairs for the Northern and Middle Districts and appointed commissioners to negotiate with the Six Nations. Significantly, the report included an instruction to the commissioners to "reassure" the Oneidas and the Tuscaroras

> that they may rely that the lands which they claim as their inheritance will be reserved for their sole use and benefit *until they may think it for their own advantage to dispose of the same.*

25 JCC 687 (Oct. 15, 1783) (emphasis added). In adopting the report, Congress spe-

cifically provided that the authorization for a treaty with the Six Nations "shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." *Id.* at 693.

The notes of one of the Treaty commissioners, Richard Butler, reflect his understanding, just two days before the Treaty was agreed to, that the commissioners were to assure the Oneidas and Tuscaroras that they may "rely on the lands which they claim ... till they think fit to dispose of them." Richard Butler's Notes on the Treaty of Fort Stanwix (Oct. 18, 1784), *Richard Butler Papers*, 3 Frontier Wars Papers (Series U) 290, Lyman Draper Manuscripts (State Historical Society of Wisconsin).

When Congress received the Treaty and ordered it published, it adopted language offered by Melancton Smith, a delegate from New York, declaring that "no purchases, which have been or hereafter may be made from the Indians, at any treaties held or to be held with them, of their right to soil *within the limits of any state,* can, ought, or shall be considered as interfering with the right of any such state to the jurisdiction or soil." 28 JCC 426 (June 3, 1785).

There is one aspect of the Treaty negotiations that arguably lends support to the appellants' position, but, understood in context, it is insufficient to overcome the contrary evidence. On two occasions the federal treaty commissioners spoke to the leaders of the Six Nations concerning the exclusivity of federal authority. Appellants view these remarks as conveying to the Indians the understanding that all sales of Indian land would require the approval of Congress. Appellees interpret the remarks as indicating only that the federal commissioners had the exclusive authority to negotiate on matters of peace. The first statement was made on October 12, 1784, at the opening of the treaty negotiations. One of the federal commissioners said:

> [W]e also tell you that we have full authority to transact all business between the United States, and you, and that without the authority of Congress no

business can be valid that may be attempted by particular people or States. II *The Olden Time* 407 (Craig ed. 1846). On October 12, 1784, the Indians were told "not to listen to any overtures made to you by any person or body of men or by any particular State not authorized by Congress." Wayne MSS, *supra.* A Mohawk chief, Aaron Hill, responded on October 17 in remarks that left the ambiguity unresolved:

> You directed us not to attend to what any particular state might say to us on public business, for that the commissioners or Congress alone were adequate to the purpose.

*Id.*

The unsuccessful efforts of New York to negotiate a peace treaty with the Six Nations earlier in 1784 makes it clear that the references in these remarks are to state negotiations over peace, not purchase of land. In March 1783, the New York legislature had formulated a plan to end hostilities with the Six Nations under an arrangement whereby New York would displace the Senecas, the Onondagas, and the Cayugas from the lands they claimed within New York's borders and then negotiate with the Oneidas to exchange their land for land previously owned by the Senecas. H.S. Manley, *The Treaty of Fort Stanwix* 28–29 (1932). The legislature instructed its Indian commissioners to negotiate with the Oneidas. New York's plan aroused serious concern in Congress that New York's attempt to negotiate peace with the Six Nations by removing some of the tribes from New York's borders would precipitate hostilities. Undaunted, New York's Governor Clinton in April 1784 invited the Mohawks, Onondagas, Cayugas, and Senecas to a meeting to adjust all differences between them, the Oneidas and the Tuscaroras, and New York. A meeting was set for August at Fort Stanwix. Governor Clinton and the New York Indian commissioners met first with the Oneidas and Tuscaroras, assuring them of their friendship. Then, meeting with the four hostile nations, the New York delegation sought to obtain an outright cession of their lands within New York's bor-

ders. This demand was refused, and New York's attempt to consummate a separate peace ended in failure.

It was this episode that prompted the remarks of the federal commissioners to the Six Nations at Fort Stanwix later in the fall of 1784. In a letter to the President of the Confederal Congress on October 5, 1784, just two days after the first remarks relied on by the appellants, the federal commissioners, writing from Fort Stanwix, gave this report of what had occurred:

> Tho we gave due information to the Governor of this State of the time & place of holding the treaty, that if he had any business to transact with the Indians he might do it under the patronage of the U.S. But he chose to hold a treaty with the Six Nations before us, & we are told *endeavored to make peace with them* in the name of this State.... [W]e thought proper to inform the Indians in our conference, that a treaty with an individual State without the sanction of Congress could be of no validity.

Papers of the Continental Congress, National Archives Microfilm Publications, Microcopy No. M–247, roll 69, p. 133 (emphasis added). Aaron Hill, the Mohawk Chief, also had the abortive New York peace treaty efforts in mind when on October 17 he acknowledged the advice of the federal commissioners not to deal with a state on "public business":

> We of the Six Nations are fully sensible of the truth of this and we think that no particular State can have a right to treat separately, but that it belongs only to the United States. In consequence of this when the Governor of New York sent a message to us, to assemble us here in order to treat with that State, we requested that it might be a continental treaty as we perceived that the United States formed one general plan.

Wayne MSS, *supra.*

■ Appellants contend that all of this evidence at least raises a question whether the Indians understood the federal commissioners to be assuring them that approval of Congress was needed not only for state peace treaties but also for state land pur-chases. Furthermore, they argue, "[h]ow the words of the treaty were understood by [the Indians] rather than their critical meaning, should form the rule of construction," *Worcester v. Georgia, supra,* 6 Pet. at 582 (McLean, J., concurring), and that ambiguities should be resolved in favor of the Indians, *Winters v. United States,* 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). We agree with these principles but conclude that they do not support the appellants' contention. What are sought to be construed in favor of the appellants are not ambiguous terms of a treaty but ambiguous statements made in the course of negotiating a treaty. If ambiguities in such remarks always required resolution in favor of alleged understandings on the part of Indians, there would be virtually no limit to how far Indian treaties would be extended. We are satisfied, as was Judge McCurn, that the evidence assembled in the District Court does not show that the Six Nations were told that ordinary land purchases by New York, separate from negotiation of a peace treaty, required approval of Congress. Indeed, one of the clearest indications that the Oneidas had no such understanding is their readiness to make the first of the two sales challenged in this litigation, a sale made without congressional assent just eight months after the Treaty of Fort Stanwix. In any event, we also agree that Article II of the Treaty, securing the Oneidas in the possession of their land, would have to be not merely construed but virtually rewritten to prohibit them from selling their land to New York without the approval of Congress. The Treaty claim was properly rejected.

## IV. The Claim Under the Proclamation of 1783

■ On September 22, 1783, the Confederal Congress issued a proclamation prohibiting

> all persons from making settlements on lands inhabited or claimed by Indians, *without the limits or jurisdiction of any particular State,* and from purchasing or receiving any gift or cession of such lands or claims without the express

authority and directions of the United States in Congress assembled. . . .

25 JCC 602 (Sept. 22, 1783) (emphasis added). Both sides agree that the Proclamation of 1783 prohibited purchases, without assent of Congress, of Indian lands *outside* the borders of the States. Appellants contend that the Proclamation applied, in addition, to land *within* state borders occupied by unassimilated Indians. They further contend that even if the Proclamation applied only to land beyond state borders, the land purchased by New York in 1785 was not at that time within the fixed limits of New York. The District Court rejected this claim, as do we.

The terms of the Proclamation appear to defeat the appellants' claim, though there is a plausible textual argument in their favor. The operative words of the Proclamation appear to prohibit purchases of Indian lands "without the limits or jurisdiction of any particular State." Appellants contend, however, that the quoted phrase modifies its immediate antecedent "Indians" and not "lands," which appears five words earlier. There is a rule of construction that qualifying phrases are "generally" to be applied to words "immediately precedent" and not to others "more remote." *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751 (1st Cir.1985). For several reasons, however, it is clear that the phrase modifies the word "lands."

First, the Proclamation recites that it is adopted pursuant to the authority of Article IX(4); the Legislative Rights Proviso is quoted in full. Since Congress did not have the power to prohibit all purchases of Indian land within state borders, it should not be understood to have attempted to do so in the Proclamation.

Second, the preliminary draft of the Proclamation placed the phrase "within the United States and without the boundaries of any particular State" immediately adjacent to the word "lands," 24 JCC 505–06 (Aug. 13, 1783), and there is no indication that the rearrangement of wording was intended to effect any substantive change, much less the significant change urged by the appellants.

Third, contemporaneous correspondence of the delegates indicates that they understood the Proclamation to apply only to lands outside the borders of a state. *See, e.g.,* Letter of the Virginia Delegates to Governor Benjamin Harrison (Oct. 4, 1783), *reprinted in* 7 *The Papers of James Madison* 367 (Rutland et al. eds. 1962). There can be no doubt that an effort to issue a proclamation barring state purchases of Indian lands *within* state borders would have set off a storm of protest within the Confederal Congress. As it happened, the Proclamation was a relatively non-controversial matter.

■ As a final argument, the appellants contend that even if the Proclamation applied only to land within state borders, New York's 1785 purchase violated the Proclamation because the acquired lands were not at that time within the borders of New York. But, as the District Court concluded, based on abundant contemporaneous documentation and maps, New York's cession of its claimed Western lands fixing New York's Western boundary was complete in 1782, and the lands purchased in 1785 were well to the east of that Western boundary. *See Massachusetts v. New York,* 271 U.S. 65, 81, 46 S.Ct. 357, 358, 70 L.Ed. 838 (1926). The fact that Massachusett's lingering dispute with New York concerning the boundary was not resolved (in New York's favor) until the Treaty of Hartford on December 11, 1786, does not detract from the conclusion that the purchased land was within New York's borders in 1785.

### Conclusion

The historical evidence indicates that the Articles of Confederation, the 1784 Treaty of Fort Stanwix, and the Proclamation of 1783 are properly construed not to prohibit, or require the assent of Congress for, New York's 1785 and 1788 purchases of Indian land from the Oneidas. The appellants' claims were properly dismissed by the District Court as legally insufficient, and the judgment of the District Court is affirmed.